UNITED STATES of America,
Plaintiff-Appellee,

v.

Betty Jo MEADORS,
Defendant-Appellant.

No. 84–1266.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 2, 1984.

Decided Jan. 24, 1985.

Rehearing Denied April 8, 1985.

Gerald A. Coraz, Asst. U.S. Atty., Sarah Evans Barker, U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Stephen L. Huddleston, Huddleston & Combs, Franklin, Ind., for defendant-appellant.

Before CUDAHY, POSNER and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

Appellant Meadors appeals an order of the district court granting the Small Business Administration (the "SBA") summary judgment in its action to collect from appellant as guarantor on a loan. The district court found that the Equal Credit Opportunity Act did not protect Meadors from liability; that she had waived certain protections by signing the guaranty; and that no independent consideration was necessary for her signature as a guarantor. On appeal she raises these defenses again, and also argues that, should she be liable, the district judge erred in calculating the interest due on the note. We reverse and remand.

I.

In January, 1977, M.J.D., Inc. ("MJD") applied to the Bargersville State Bank (the "Bank") for a loan to pay off debts and to provide for additional working capital for a lumber company MJD owned in Bargersville, Indiana. The Bank's board of directors approved the loan subject to a guaranty by the SBA. In April, 1977, the SBA approved the request for a 56% guaranty of the $281,000 loan, but required the principals Melton Meadors, Jay Judd and Harold Ducote and Ducote's wife Marie to sign a guaranty on SBA Form 148. In the January application, listed on page four as possible guarantors had been: "Melton E. Meadors—a single person, Jay A. Judd & Wife, Harold A. Ducote, Jr., & Wife." After considering the loan application and attached balance sheets, the SBA chose to have Meadors, Judd, Ducote and Ducote's wife sign the required guaranty.

On April 2, 1977, Melton Meadors and Betty, appellant here, were married. At the April 19 closing the three principals and their wives were all present. Although the SBA had provided places on its Form 148 for the signatures only of Meadors, Judd, Ducote, & Ducote's wife, and although no one from the SBA was present to request additional signatures, all six—the three principals and their wives—signed the guaranty form. Neither the SBA nor the Bank required Betty to sign any document as a prerequisite for disbursing loan proceeds. These facts are not disputed by either side.

MJD defaulted on its loan, and the Bank asked the SBA to take over the guaranteed portion of the loan. MJD turned over the collateral securing the loan to the SBA in

July, 1980 and it was later sold. An action was subsequently instituted in district court to collect the deficiency from the guarantors, including Betty Meadors. Appellant raised several defenses, including lack of consideration and impairment of collateral. In November, 1983 appellee SBA filed a motion for summary judgment which was granted by the district court on February 2, 1984. It is from that grant of summary judgment that Betty Meadors appeals.

Appellant argues before this court that the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, protects her from liability; that there was not sufficient consideration for her signature on the guaranty; that the SBA willfully impaired the collateral; that she did not receive statutory notification of the sale of the collateral, and that the sale was not conducted in a commercially reasonable manner; and finally that the district court erred with respect to the amount of interest due, should she be liable on the guaranty.

There is apparently some confusion about whether Indiana law or federal law should govern in this case. In the district court appellant appealed to Indiana common law; the government has apparently relied on federal cases. Without raising the issue, the district court applied Indiana law.

 Federal law governs questions involving the rights of the United States arising under nationwide federal programs. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). "In the absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). Nevertheless, federal courts may turn to state law in attempting to give content to the federal rule in question. *United States v. Kimbell Foods, Inc.*, 440 U.S. at 727, 99 S.Ct. at 1457. Thus, on certain issues, such as impairment of collateral and the right to notice, where

"the state law on which private creditors base their daily commercial transactions is derived from a uniform statute [the U.C.C.]," and there is therefore no conflict with the federal interest in uniformity, appeal to state law is appropriate. *United States v. Kukowski*, 735 F.2d 1057, 1058 (8th Cir. 1984). On those issues, then, we look to the Uniform Commercial Code, the Indiana statute based on it, and Indiana common law.

## II.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. Pro. 56(c). In the case before us the parties do not disagree about the facts, and our only role is to determine whether, on the facts as agreed, the district court was right as a matter of law.

### A. The Interest.

For reasons not apparent from the record, the district court granted the government's motion for summary judgment as to Melton Meadors, Jay Judd and Helen Judd on August 8, 1983, but as to Betty Meadors not until February 2, 1984. In its February 2 order the court assessed against Betty Meadors, jointly and severally with the other defendants, the principal sum of $152,720.04, together with interest on the note of $28,213.22 accruing before the August 8 entry of judgment against Melton Meadors and the Judds and "interest accruing thereafter at the legal rate."

 The procedure for determining the interest due on judgments is set out in 28 U.S.C. § 1961:

Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment....

Appellant argues that under the statute interest on a note accrues as provided for in the note until judgment is actually entered, and after judgment at a rate set by state law, and that since judgment was not entered against Betty Meadors until February 2, 1984, interest at the higher legal rate (the difference is apparently nearly half a percentage point) should not have begun accruing until then.

The government does not contest this point in its brief, and conceded it at oral argument. We hold that the district court erred as to the interest. On remand the district court should determine interest in a manner consistent with § 1961.

## B. The ECOA Defense.

Appellant asserts that her signature on the SBA guaranty form was obtained in violation of the ECOA and is therefore unenforceable; and that in disposing of the collateral the SBA wilfully violated her rights. These claims do not merit extended discussion.

The ECOA prohibits a creditor from requiring a spouse's signature on an application for credit, if the applicant has qualified, under the creditor's standards, for the amount of the credit requested. 12 C.F.R. § 202.7(d).

 The SBA argues that since, by her own admission, Betty Meadors was not required to sign the guaranty, the ECOA is not implicated. We agree, and note that even when the creditor does require the signature of any creditworthy additional party, and the spouse accordingly elects to sign as such an additional party, he or she cannot later raise the ECOA as a defense, since such a signature is valid according to the Regulations promulgated under the act. 12 C.F.R. 202.7(d)(5).[1] Evidently the Regulation is not meant to prohibit spouses from

signing as guarantors generally, but is instead meant to prohibit a spouse's being required to sign *because he or she is a spouse;* where the spouse has not been *required* to sign at all, she can hardly be said to have been required to sign because she is the principal's spouse. Since she concedes that she was not required to sign, Betty Meadors does not fall within the protection of the ECOA, and the district court properly granted summary judgment on this issue.

## C. The Right to Notice, The Right to a Commercially Reasonable Sale and the Problem of Impairment of Collateral.

The district court found that Betty Meadors had waived three of her claims by signing the SBA guaranty form. She raises these claims again on appeal.

(i) *Notice and Commercial Reasonableness.* Betty Meadors claims that she never received notice of the SBA's possession and sale of the collateral. She argues that such notice is required by Indiana Law. *See* Ind.Code § 26-1-9-504 (1976). She also claims that, since she never received notification of the sale, the burden is on the SBA to prove that the sale was conducted in a commercially reasonable manner. *See* Ind.Code § 26-1-9-504(3) ("every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.") She also claims that the sale was not commercially reasonable because the collateral was sold for much less than it was worth.

The guaranty that Betty Meadors signed contained provisions waiving the right to notice and the right to object to the conditions of sale:

The Undersigned hereby grants to Lender full power, in its uncontrolled discretion and *without notice* to the under-

---

**1.** § 202.7(d)(5):

If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the extension of the credit requested, a creditor may request that the applicant obtain a co-signer, guarantor, or the like. The applicant's spouse may

serve as an additional party, but a creditor shall not require that the spouse be the additional party. For the purposes of paragraph (d) of this section, a creditor shall not impose requirements upon an additional party that the creditor may not impose upon an applicant.

signed, but subject to the provisions of any agreement between the debtor or any other party and Lender at the time in force, to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers:

. . . . .

(e) In the event of nonpayment when due, . . . or in the event of default . . ., to realize on the collateral . . . at any public or private sale . . . *without* demand, advertisement or *notice* of the time or place of sale . . . (the Undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law) . . . all as Lender in its uncontrolled discretion may deem proper. . . .

(Emphasis added.) The district court found no provision in any other agreement that would undermine this waiver, and appellant has not brought any to our attention.

SBA guarantors are unconditional or absolute guarantors, and federal courts have held that, by signing the guaranty, they waive such rights as appellant now claims. *United States v. Kukowski,* 735 F.2d 1057, 1058 (8th Cir.1984); *United States v. Outriggers, Inc.,* 549 F.2d 337, 339 (5th Cir. 1977); *First National Park Bank v. Johnson,* 553 F.2d 599, 601–02 (9th Cir.1977).

The appellant argues that under Indiana law certain rights, including the rights to notice and to a reasonable disposition of the collateral, may not be waived in advance by the *debtor, see* Indiana Code § 26–1–9–501(3), and that Indiana Code § 26–1–9–504 assures a guarantor the same rights as a debtor. That much is true. But the Indiana Code does not say that those rights cannot be waived by a guarantor, and the Indiana courts have held that in fact a guarantor can waive such rights. *Carney v. Central Nat. Bank of Greencastle,* 450 N.E.2d 1034, 1037–39 (Ind.App.1983); *Holmes v. Rushville Production Credit Ass'n,* 170 Ind. App. 509, 353 N.E.2d 509, 512–13, *opinion on rehearing,* 170 Ind.App. 509, 355 N.E.2d 417, *suppl. opinion,* 170 Ind.App.

509, 357 N.E.2d 734 (1976) (reinstating original opinion).

█ We find, therefore, that Betty Meadors waived her right to notice and to a commercially reasonable sale when she signed the guaranty, and that the district court properly granted summary judgment on these issues.

(ii) *Impairment of Collateral.* Meadors also claims that the SBA willfully "impaired the collateral" by granting an interest in the proceeds to a creditor to whose claims its own were prior. Although Meadors also waived a right to reasonable care in the disposition of the collateral, the guaranty provides that the guarantor does not waive his protection where the "deterioration, waste or loss be caused by the willful act or willful failure to act of Lender." Since Meadors alleges willful impairment, this claim was not waived by the provisions of the guaranty.

█ As the government points out, however, the issue of willful impairment was not raised in the district court, where Meadors pleaded as an affirmative defense only that the collateral had been negligently impaired. The issue of willful impairment is therefore not properly before this court. *Stern v. Gypsum, Inc.,* 547 F.2d 1329, 1333 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Protection against negligent impairment was waived by the provisions of the guaranty. Summary judgment on this issue was therefore also appropriate.

III.

Betty Meadors argues, finally, that she received no consideration for her signature on the guaranty form. She reasons that the signature of a volunteer, who happens upon an agreement after the negotiations have been concluded and the terms set, and who signs as a guarantor although neither side has required her to sign, has not received consideration and therefore is not bound by the agreement.

Consideration has long and consistently been treated as an essential element of

every contract. Yet there is little agreement about just what consideration is, and that fact makes it difficult to assess a defense of want of consideration in a novel setting. We venture that the setting in which it is raised here is very nearly unique, and the validity of the defense would seem to depend on which interpretation of the doctrine we adopt.

Every interpretation has serious faults. It used to be said that consideration was either a benefit to the promisor, or a detriment to the promisee. In other words, the one who made the promise receives consideration if he gets something, or if the one to whom he makes the promise gives something up. Either alternative will do. If I promise you a thousand dollars if you quit smoking, and you do quit, then even though there may be no benefit to me, I have received consideration: you have given something up. Similarly, I can promise you a thousand dollars if you teach my daughter to sing. If you do teach her—or if you promise to—then I have received consideration even if all the practice sessions and even the final result are of no real benefit to me.

But reflection shows that benefit-detriment is neither necessary nor sufficient for consideration. I may promise to give you a thousand dollars if you quit smoking—I may even do it in writing—and you may give up smoking, and yet my promise may be unenforceable and may be the sort of thing that everyone would agree was without consideration. For you may have given up smoking without ever having learned of my promise. So the detriment in isolation is not sufficient for consideration. On the other hand, I might agree to pay you for something that was neither a benefit to me nor a detriment to you. I might promise to pay you for bringing a benefit on yourself. The reasoning in the classic case of *Hamer v. Sidway*, 124 N.Y. 538, 27 N.E. 256 (N.Y. App.1891), suggests that the courts will find consideration in such a case. An uncle had promised his nephew $5000 on his twenty-first birthday if the nephew would refrain from drinking, smoking, swearing and playing cards until that time. The nephew evidently fulfilled his part of the deal, but the uncle's executor resisted his claim against the estate. The court found the promise enforceable:

> The defendant contends that the contract was without consideration to support it, and therefore invalid. He asserts that the promisee, by refraining from the use of liquor and tobacco was not harmed, but benefitted; that that which he did was best for him to do, independently of his uncle's promise,—and insists that it follows that, unless the promisor was benefitted, the contract was without consideration.... Such a rule would not be tolerated and is without foundation in the law.... Courts will not ask whether the thing which forms the consideration does in fact benefit the promisee or a third party, or is of any substantial benefit to anyone. It is enough that something is *promised*, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him.

*Id.* at 257 (emphasis added).

Perhaps because of such difficulties, the benefit-detriment account of consideration was replaced by a "bargain" theory: there is consideration when each promise or performance has been bargained for, when each has been offered as inducement for the other:

> [I]t is the essence of a consideration, that, by the terms of the agreement, it is given and accepted as the motive or inducement of the promise. Conversely, the promise must be made and accepted as the conventional motive or inducement for furnishing the consideration. The root of the whole matter is the relation of reciprocal conventional inducement, each for the other, between consideration and promise.

O.W. HOLMES, THE COMMON LAW 293–94 (1881)[2] The bargain-exchange account fits

---

**2.** "Going back into the past, there was an indefinite number of cases which had imposed liabili-

ty, in the name of consideration, where nothing like Holmes's 'reciprocal conventional induce-

rather neatly into an economic analysis of common law, which sees in this version of the doctrine of consideration an attempt to select out for enforcement those contracts—namely bargained-for exchanges—that promote the increase of value in society.

> The state has an independent interest in the enforcement of [bargain] promises. Exchange creates surplus, because each party presumably values what he gets more highly than what he gives. A modern free-enterprise system depends heavily on private planning and on credit transactions that involve exchanges over time. The extent to which private actors will be ready to engage in exchange, and are able to make reliable plans, rests partly on the probability that bargain promises will be kept. Legal enforcement of such promises increases that probability.

Eisenberg, *Principles of Consideration,* 67 CORNELL L. REV., 640, 643 (1982).[3] But a bargained-for exchange is also neither necessary nor sufficient for the existence of consideration. For there is no consideration where an author agrees to give his agent the exclusive right to deal with a manuscript during a six month period, in return for the agent's agreement to add the manuscript to his list, without a promise that the agent will try to place it. Such agreements are unenforceable, yet "there is a bargain in the sense that the author has obtained something he wants—namely, the chance that this agent might peddle his

manuscript—something he could not have obtained other than in return for his promise." C. FRIED, CONTRACT AS PROMISE 31 (1981). And where someone undertakes an obligation because of an obligation that existed in the past but is no longer enforceable, there is consideration even though there is no bargain or exchange. *See Zabella v. Pakel,* 242 F.2d 452 (7th Cir.1957); RESTATEMENT (SECOND) OF CONTRACTS §§ 82, 83.

Of course, if any theory could persuade us that the cases that stand as counterexamples to it were wrongly decided, we might accept the theory in spite of the cases. But the tendency in the courts has been to favor the accumulated wisdom of the common law over the simplicity of any single-minded theory. Thus Eisenberg argues that consideration is a guise under which judges have tried to deal fairly with contract difficulties, and argues that it is time now to relegate the doctrine and its epicycles to the history books, and bring fairness out into the open in decision-making.

> In the past courts decided issues of fairness covertly, and expressed their decisions through the manipulation of rules and exceptions purportedly designed for other ends.... The agenda for the legal community is ... to encourage the courts to perform such review openly.

67 CORNELL L.REV., at 640–41.[4]

Although it is a beguiling thought to drop the mask and do justice openly, the

---

ment' was anywhere in sight." G. GILMORE, DEATH OF CONTRACT 63 (1974). Gilmore saw Holmes as trying to change the law, and succeeding. "There is never any point in arguing with a successful revolution. What Holmes told the young lawyers who flocked to his lectures in the spring of 1881 promptly became the truth—the indisputable truth—of the matter for his own and succeeding generations." *Id.* at 21.

**3.** This position is subject to two different sorts of criticism: (1) unilateral promises also increase surplus, Posner, *Gratuitous Promises in Economics and Law,* 6 J. OF LEGAL STUD. 411, 412 (1977); and (2) if it is the promotion of exchanges in the market place that is sought, why extend enforcement to, for example, intrafamilial contracts or the contract between me and the

fellow who sells me his car? C. FRIED, CONTRACT AS PROMISE 36–37 (1981).

**4.** The movement in the law rather suggests that we may have in the not too distant future a more candid set of principles to determine which promises should be enforceable in terms of the fairness of each type. We are moving in that direction as a result of decisions and statutes lending validity to types of promises whose legitimacy had been in doubt under the doctrine of consideration.... Secondly, we are moving in that direction as a result of a more open willingness to stigmatize certain promises as unfair or unconscionable and to deny enforcement on that ground rather than on the ground of insufficient consideration. C. FRIED, *supra,* at 39.

present case seems to us to make manifest the emptiness of such an approach. Having dropped the guise of consideration, what is the fair outcome in a case in which a wife (apparently) gratuitously affixes her name to a guaranty intended for her husband? Where the rules of contract law clearly dictate one result or the other (and there is no fraud or unconscionability) then the fair outcome might be to enforce that result. But to find such rules we are driven back to the doctrine of consideration and its exceptions.[5]

Since the just solution does not leap out at us, therefore, let us begin by pressing the doctrine of consideration as far as it will go. Where there is no consideration, it has been the general rule that the contract is not enforceable. In this case, under the versions of the doctrine we are acquainted with, there has been no consideration. The government suffered no detriment: its undertaking would have been precisely the same (on the account we have before us) whether or not Mrs. Meadors had signed the guaranty. She gained no benefit, either; whatever benefit passed to her and her husband because of the loan would have passed without her signature. And no bargain was involved. The SBA gave up nothing to induce Mrs. Meadors to sign; her signature induced no act or promise on the part of the SBA. Since there has been no consideration, the general rule would deny the government enforcement of the contract.

▉ The general rule applies to guaranties. If there has been no consideration for a guaranty, the guaranty is not enforceable. But the mindless application of that rule tends to produce unacceptable results; for example, a guarantor ought not to be able to raise the defense that he received no *separate* consideration for his agreement to act as guarantor—no guaranty would ever be enforceable in such a case unless it could be shown that the guarantor had been paid for his undertaking. And so an apparent exception to the rule arose: no *independent* consideration is necessary for a guaranty signed at the same time as the principal agreement. The exception is only apparent since it does not deny that consideration is necessary; it only denies that *separate* consideration is necessary. In other words, the loan made by the promisee may be made in consideration for the signatures both of the principal and the guarantor: he may have been unwilling to make the loan in the absence of either.

> If the promises of the principal and the surety are made simultaneously, they may be made for a single consideration; the loan of money by the creditor to the principal is a sufficient consideration for the promises of both principal and surety.

Corbin on Contracts § 213.[6] That rule, on its face, suggests that because the signing was simultaneous the appellant here cannot raise the defense of lack of consideration. On a benefit-detriment theory, there is nothing more to be said about it.

We believe, however, that that outcome is wrong, and—although cases on this point are naturally rare—we are supported in our belief by the commentators and by the bargain-exchange interpretation of the doctrine of consideration.[7] This is not the

---

5. It may seem that, in our effort to find a rule that gives the just result, we have given considerations of simplicity short shrift. Although we think that the best argument for a result different from the one we reach here would be based on the simplicity of a rule that automatically bound signers, the same argument could be made for any per se rule and does not seem to us to weigh heavily in the balance.

6. Corbin distinguishes guaranties made subsequent to the principal agreement as requiring separate consideration. There are cases holding that even in such circumstances no separate

consideration is necessary, but in each such case it is clear that the guaranty had been bargained for with the main agreement, or there is some other explanation for the apparent discrepancy.

7. Whether or not the contract-as-promise theory yields the same result would seem to depend on what we mean by "promise;" if one condition of something being a promise from X to Y is that Y be aware of it, then there would seem to be no contract in this case. In Fried's version of the theory communication of the promise to Y is an essential element of promising; Fried sees

ordinary case of the guarantor signing simultaneously with the principal; this is more like the case mentioned earlier in which X promises to pay Y a thousand dollars if Y gives up smoking, and Y gives up smoking without ever learning of X's promise. Whether or not there has been benefit to one party or detriment to the other, there has been no bargain here, and the SBA made the loan apparently in ignorance of Mrs. Meadors' signature. If those are the facts, then we believe that not only has there been no *independent* consideration, there has been no consideration at all.

In *Banco Credito v. Ahorro Ponceno v. Scott*, 250 A.2d 387 (Del.Super.1969), the problem was the inverse of the one we have here: the guarantor's signature had been bargained for but, without the creditor's knowledge, the guarantor failed to sign. The court relied on CORBIN § 213 ("[b]ut for the promise of any surety that is made subsequently to the advancement of the money to the principal, there must be a new consideration") to conclude that his later signing could not bind him without new consideration. In the most recent CORBIN (1984 Supplement), the editor discusses that opinion:

> [I]t is questionable whether [the rule relied on by the court] was properly applied to the facts alleged. If the guarantee by Scott was at all times contemplated to be given by the parties, then the debt was not "pre-existing" but actually substantially contemporaneous, though considerable time passed before Scott actually got around to signing it.... *On the other hand, if Scott's signature was not originally contemplated as part of the deal, then the debt was "pre-existing" though Scott signed within the hour.*

C. KAUFMAN, CORBIN ON CONTRACTS § 213 (1984 Supplement) (emphasis added). And this last alternative Corbin contemplates is just the case before us.

For Corbin, the lack of consideration is clear from the fact that the signature was not originally contemplated as part of the deal. Where the creditor does not even know of the signature—as we are assured by both parties is the case here—the lack of a bargain and consequent lack of consideration is even clearer:

> Even if the promisee takes some action subsequent to the promise (so that there is no problem of past consideration), and even if the promisor sought that action in exchange for his promise, ... that action is not bargained for unless it is given by the promisee in exchange for the promise. In other words, just as the promisor's purpose must be to induce an exchange, so the promisee's purpose must be to take advantage of the proposed exchange. *In practice, the principal effect of this requirement is to deny enforcement of the promise if the promisee takes the action sought by the promisor without knowledge of the promise. As might be supposed, examples are infrequent.*

E. FARNSWORTH, CONTRACTS 64 (1982).[8] On the undisputed facts, this case is one of Farnsworth's infrequent examples.

█ We note in passing that U.C.C. § 3-408 does not apply here. The first sentence of that section reads:

> Want or failure of consideration is a defense as against any person not having the rights of a holder in due course, *except that no consideration is necessary for an instrument or obligation*

communication as one of the elements that the doctrine of consideration, in its own befuddled way, has tried to provide. C. FRIED, *supra*, at 41–42.

**8.** Eisenberg also suggests the rarity of such cases:

> The proposition that bargains involving the performance of a pre-existing contractual duty are often gratuitous is empirically far-fetched. Perhaps a few such cases could be found, but I have never run across one. In any event, if such cases really do arise, they neither need nor justify a special rule. As Comment a [to § 573 of the Restatement Second of Contracts] points out, "[i]f the performance was not in fact bargained for and given in exchange for the promise, the case is not within this section: in such cases there is no consideration...."

67 CORNELL L.REV., at 644–45.

*thereon given in payment of or as security for an antecedent obligation of any kind.*

This last clause does not exempt guaranties from the need for consideration since it applies only to negotiable instruments. *See* U.C.C. § 3–102(1)(e). A guaranty is not a negotiable instrument if it contains a conditional promise to pay, as this one does. *See* U.C.C. § 3–104(1)(b).

> U.C.C. § 3–408 relates only to the validity of commercial paper and does not abolish any preexisting requirement that the underlying contract or an independent contract of guaranty be supported by consideration.

ANDERSON, UNIFORM COMMERCIAL CODE § 3–408:5 (1984). The rationale behind the exception for negotiable instruments "is that since the obligor is in fact indebted to the holder, there is no reason to excuse him from his liability on an instrument which simply makes the chose in action more easily transferable by the holder." W. HAWKLAND and L. LAWRENCE, UNIFORM COMMERCIAL CODE SERIES § 3–408:04 (1984). In other words, one who pays off an obligation with a negotiable instrument cannot complain that he has not received consideration for that "instrument or obligation thereon." The cancellation of the prior debt is consideration enough.[9]

Indiana law does not raise any difficulties for the position we adopt. *See especially Davis v. B.C.L. Enterprises, Inc.,* 406 N.E.2d 1204, 1205 (Ind.App.1980) ("If the guaranty is made at the time of the contract to which it relates, *so as to constitute a part of the consideration of the contract,* it is sufficient.").

██ We hold, therefore, that summary judgment for plaintiff was not appropriate on this point. Although the parties have apparently agreed on the relevant facts, we feel that it would also be inappropriate for us to decide as a matter of law that the guaranty is unenforceable. The district court, relying on a different construction of the law, did not take evidence on the question. Construing the law as we have construed it, it must be resolved whether in fact Betty Meadors' signature was in any respect whatsoever required, anticipated, requested or relied upon (or, in fact, known of); because if it was not, it was wholly irrelevant to the transaction and does not create an enforceable obligation.

REVERSED AND REMANDED.

---

9. "The 'except' clause is intended to remove the difficulties which have arisen where a *note or draft,* or an indorsement of either, is given as payment or as security for a debt already owed." Comment 2 to U.C.C. § 3–408 (emphasis added).