216 N.J. Super. 115 (1987)
523 A.2d 223
LENAPE STATE BANK, PLAINTIFF-RESPONDENT,
v.
WINSLOW CORPORATION A/K/A WINSLOW CORPORATION COMPONENT HOUSING AND WOOD MANUFACTURING INC., NEW JERSEY CORPORATION, KENNETH A. GEWERTZ, INDIVIDUALLY AND RONALD A. KAPLAN, INDIVIDUALLY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted October 21, 1986.
Decided March 13, 1987.
*116 Before Judges BRODY, LONG and D'ANNUNZIO.
Sternstein & Sternstein, P.A., attorneys for appellant Gewertz (Neil I. Sternstein, on the brief, Goodman, Schneider and Cohen; Harold G. Cohen, of counsel and on the reply brief).
Holston, MacDonald, Donnelly and Morgan, attorneys for respondent (James D. Donnelly, of counsel and on the brief).
The opinion of the court was delivered by LONG, J.A.D.
The principal question presented on this appeal is whether a Small Business Administration (SBA) guaranty signed by defendant, *117 Kenneth A. Gewertz, was meant to be "absolute and unconditional" and, if so, whether Gewertz could assert any claims in connection with the collateral pledged on the loan with respect to which he signed the guaranty.
The case arose on June 2, 1977, when Gewertz, president of Winslow Corporation, signed and delivered a promissory note to Lenape State Bank (Lenape) in the sum of $350,000. Gewertz signed the note in his individual capacity and also as president of Winslow. This money was to be used to purchase fixed assets, inventory and motor vehicles for Winslow.
To secure the debt evidenced by the note a mortgage pledging the property and personalty of Winslow to Lenape was signed by Gewertz as president of the corporation. Because the Small Business Administration (SBA) was a participant in the loan from Lenape, Gewertz also signed an SBA guaranty in both his individual and corporate capacities agreeing to be personally liable for the repayment of the debt.
Winslow defaulted on the loan by failing to make a payment of principal and interest due on November 1, 1978. Up until that time Winslow had made 13 payments, reducing the principal of the loan from $350,000 to $325,756.73. Gewertz and Lenape then attempted to work out a compromise. In August of 1979, as a result of these negotiations, Gewertz arranged to lease Winslow's real and personal property to J. Leon Stevens and James M. Wilson. Under the terms of the lease, payments on the mortgage were required to be made by the lessees directly to the SBA. Wilson and Stevens defaulted on the mortgage after four payments. Lenape was aware of this but allowed Wilson and Stevens to remain in default for over a year without notice to Winslow or Gewertz.
On April 3, 1980, Winslow filed a petition under Chapter 11 of the Bankruptcy Code. On February 26, 1981, Lenape filed a complaint seeking to foreclose on the mortgage from Winslow. Pursuant to the provisions of 11 U.S.C. § 362(a), the foreclosure *118 proceeding was automatically stayed pending relief from the Bankruptcy Court.
On May 22, 1981, Winslow and Gewertz obtained a judgment in the amount of $115,000 against Stevens and Wilson for failure to satisfy the terms of the lease. The record does not indicate whether this judgment has value, and if so, whether it has been collected.
Prior to the foreclosure, Gewertz arranged a sale of the real and personal property of Winslow's assets to the H & M Pallet Company, Inc. and its owner Harvey Salkow. Salkow signed a letter of intent to purchase Winslow which stated, among other things, that Lenape and the SBA would forego collecting $76,000 in interest due; that Gewertz would remain a personal guarantor on the note and that the sale was conditioned upon approval by Lenape. In a letter dated October 20, 1981, Lenape agreed to the sale provided that Gewertz's judgment against Wilson and Stevens was assigned to Lenape and that it had value. On August 31, 1982, in a letter to the bankruptcy judge handling Winslow's assets, the SBA also agreed to the sale. However, thirteen days later Salkow informed the bankruptcy judge that due to a recent fire and the economic times he would not be able to complete the deal. Although the record is unclear as to the details of the claim, Gewertz alleges that the deal with Salkow went sour because of Lenape's lack of cooperation which resulted in an inordinate delay. During the delay, Salkow suffered the financial reverses which caused him to renege.
On April 27, 1983, the bankruptcy stay was dissolved permitting Lenape to proceed with its foreclosure against the real estate and personalty of Winslow. Pursuant to a writ of execution, the sheriff of Camden County sold the property to Lenape at a public sale for $100. Lenape offered the property at a public auction on October 24, 1983. The auction advertisement mistakenly indicated that the property had 50 feet of roadside frontage when in fact it has 500 feet. In addition, *119 prior to the sale, the auctioneer incorrectly announced that the property could only be used for residential purposes when in fact it could be, and had been, used for commercial purposes. It is uncontroverted that Gewertz was never notified of the time and place of the sale.
Only one person bid on the property. While the property had been appraised for Lenape at $249,000 the sale only brought $141,397.07.[1] Of this amount, $868.58 was credited towards the principal leaving a total principal due of $324,888.15 as of October 24, 1983. On November 10, 1983, Lenape filed an action seeking to recover this deficiency from Winslow and Gewertz. Eventually Gewertz answered, claiming derelictions by Lenape both before and after the default which reduced the value of the collateral thereby absolving him from his obligations for the deficiency.
Lenape moved for summary judgment on the ground that Gewertz signed an absolute and unconditional guaranty thereby waiving any and all rights concerning Lenape's treatment of the collateral. Gewertz opposed the summary judgment motion contending that material issues of fact existed as to his claims that Lenape willfully impaired the collateral prior to default and that after the default the sale of the collateral was carried out in a commercially unreasonable manner.
Although the trial judge appeared to be uncertain as to whether federal or state law governed the interpretation of the SBA guaranty, he ultimately determined that the guaranty signed by Gewertz made him an unconditional and absolute guarantor thereby waiving all his rights to question anything Lenape might have done with the collateral either before or after default and that he was not entitled to claim the defense of commercial reasonableness. As a result, he entered judgment against Gewertz in the amount of $406,854.64.
*120 At the heart of this appeal is Gewertz's contention that the SBA guaranty did not render him an absolute and unconditional guarantor or extinguish his rights in the collateral. Underpinning Gewertz's argument is a series of distinct claims. Broadly, these claims fall into two categories: allegations of wrongdoing by Lenape prior to the default on the mortgage, and allegations of wrongdoing by Lenape after the default, during the process of foreclosure and sale. More particularly, the pre-default claims are that Lenape intentionally obstructed the sale to Salkow by failing to cooperate in it, and improperly administered the loan during the Wilson and Stevens lease by allowing the lessees to remain in default for over a year without notifying Gewertz so that he could remedy the situation.
The post-default claim is that the sale of the property was carried out in a commercially unreasonable manner. There are several aspects to this: the erroneous auction advertisement; the erroneous auctioneer's announcement; the failure to notify Gewertz of the time and place of sale, and the sale of the property for $141,397.07 when it was appraised for $249,000. Recognizing the distinction between Gewertz's claims is important because different principles govern their disposition.
We turn first to the question of whether federal law or New Jersey law governs the interpretation of the SBA guaranty. The seminal case in this area is Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) where the Court was faced with a choice of law question in determining the rights of parties concerning the forgery of a check drawn on the United States Treasury in the State of Pennsylvania. The Court determined that controversies involving the United States Treasury and the rights and duties of the United States on commercial paper implicate federal interests of a sufficient magnitude to dictate that federal law should govern. In refusing to rely on state law to determine the liability of a party paying on the forged endorsement, the court concluded that:

*121 The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. [Clearfield Trust, supra, 318 U.S. at 367, 63 S.Ct. at 575]
In United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), the Court again addressed the question of the primacy of federal law in determining whether the state coverture law of Texas should apply to a loan made by the SBA. The case arose after a foreclosure when the SBA sought to satisfy a deficiency. The debtor interposed the defense that in Texas a married woman could not bind her separate property without a prior court order. The Court determined that the government's interest in collecting the moneys it has lent was not a sufficient "federal interest" to override the application of state coverture law under the Clearfield Trust doctrine. The Court, however, made it clear that its decision did not mean that state law applies under all circumstances to loans negotiated by the SBA:
We decide only that this Court, in the absence of specific congressional action, should not decree in this situation that implementation of federal interest requires overriding the particular state rule involved here. Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements. [Yazell, supra, 382 U.S. at 352, 86 S.Ct. at 507]
In essence, the Court left to a case-by-case analysis the issue of whether there is a sufficient "federal interest" to warrant the application of federal law.
By far the most important decision in this connection is United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). There the court faced an issue of priority between contract liens under a federal loan program and private liens perfected under state law. The threshold question was one of choice of law. The Court found that the involved federal agencies (SBA and FHA) "unquestionably perform federal functions within the meaning of Clearfield" and *122 that these loan transactions should be governed by federal law. Kimbell Foods, supra 440 U.S. at 723, 99 S.Ct. at 1455. Standing alone, however, this is an overbroad expression of the real thrust of the case because the application of the federal rule, as often as not, results in the incorporation of state law. The Court in Kimbell Foods concluded that state law could be adopted as the federal rule of decision so long as a national rule was not needed to protect the federal interests underlying the program. Indeed, that is exactly what occurred in Kimbell Foods. The Court stated that "[c]ontroversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules." Ibid. The Court held that where the United States acts as a commercial lender and no specific federal statute applies, the decision as to whether to adopt state law or to fashion a nationwide federal rule is dependent on the consideration of three factors:
[the] need for a nationally uniform body of law,... whether application of state law would frustrate specific objectives of the federal programs ... [and] the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. [Kimbell Foods, supra, 440 U.S. at 724, 99 S.Ct. at 1456]
Applying these factors, the Court in Kimbell Foods concluded that there was no need for a uniform rule. More particularly, it held that the application of state law to determine the rights of the United States as against creditors would in no way hinder the administration of the SBA and FHA loan programs because these operations are adapted to state law and federal regulations require federal employees to follow state law in administering the programs.
In rejecting the Government's claim that analyzing security arrangements under local law would necessitate close scrutiny of each transaction thereby impeding the expeditious processing of loans the Court stated:
Choosing responsible debtors necessarily requires individualized selection procedures, which the agencies have already implemented in considerable detail. Each applicant's financial condition is evaluated under rigorous standards in a *123 lengthy process. Agency employees negotiate personally with borrowers, investigate property offered as collateral for encumbrances, and obtain local legal advice on the adequacy of proposed security arrangements. In addition, they adapt the terms of every loan to the parties' needs and capabilities. Because each application currently receives individual scrutiny, the agencies can readily adjust loan transactions to reflect state priority rules, just as they consider other factual and legal matters before disbursing Government funds. [Kimbell Foods, supra, 440 U.S. at 732-733, 99 S.Ct. at 1460-1461 (citation and footnotes omitted)]
In 1981, the United States District Court applied the rationale of Kimbell Foods to a case involving an SBA guaranty identical to that at issue here and assumed (without deciding) that State law should apply. United States v. Kurtz, 525 F. Supp. 734 (E.D.Pa. 1981), stay denied 528 F. Supp. 1113 (E.D.Pa. 1981), aff'd without opinion, 688 F.2d 827 (3rd Cir.1982), cert. den. 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). As a basis for this assumption, the Court observed that after Kimbell Foods "the majority of federal courts which have addressed this choice of law issue have concluded that, at least where the pertinent statute is the Uniform Commercial Code (U.C.C) as adopted by a particular state, the federal rule incorporates state law." Id. at 744, n. 18; United States v. Public Auction Yard, 637 F.2d 613, 615 (9th Cir.1980); In Re Murdock Mach. & Eng'ring Co., 620 F.2d 767, 772-773 (10th Cir.1980); United States v. Irby, 618 F.2d 352, 355 (5th Cir.1980).
Cases decided subsequent to Kurtz have concurred in this holding. In United States v. New Mexico Landscaping, Inc., 785 F.2d 843, 845 (10th Cir.1986) the court held that the New Mexico U.C.C. should be incorporated as the substantive federal law in determining whether the signer of an SBA guaranty can raise the defense of commercial reasonableness. In United States v. Meadors, 753 F.2d 590, (7th Cir.1985) in construing a similar SBA guaranty, the court found that "on certain issues, such as impairment of collateral and the right to notice, where `the state law on which private creditors base their daily commercial transactions is derived from a uniform statute [the U.C.C.],' and there is no conflict with the federal interest in uniformity, appeal to state law is appropriate." Id. at 592 *124 citing United States v. Kukowski, 735 F.2d 1057 (8th Cir.1984) (where that court applied North Dakota's U.C.C. in determining the rights of a guarantor under an SBA guaranty).
We are well satisfied that under Kimbell Foods New Jersey law should be applied to this transaction. There is clearly no more need for a nationally uniform body of law under the circumstances here presented than those considered in Kimbell Foods. Permitting New Jersey law, especially the provisions of the U.C.C., to govern the rights of parties under an SBA guaranty would in no way hinder the administration of the SBA loan programs because local SBA officials are especially familiar with the particulars of this State's laws. In essence, because each application is routinely given individual scrutiny, where the SBA can easily adjust the loan transaction to accommodate New Jersey law, there is no need for a uniform rule. United States v. Kurtz, supra.
We turn next to the questions of the meaning and effect of the SBA guaranty under New Jersey law and whether, in the face of the guaranty, Gewertz may assert that Lenape impaired the collateral to his detriment. When a lender allows a third party to obligate himself to personally account for a debt in the event of a principal debtor's default, the third party becomes a surety or guarantor. N.J.S.A. 12A:1-201(40). Since a surety or guarantor has pledged himself to be personally liable for any deficiency not accounted for by the collateral he has a strong interest in the preservation of value of the collateral. Any reduction in that value could, in the future, increase the surety's liability. As a result, N.J.S.A. 12A:3-606 provides:
Impairment of Recourse or of Collateral.
1. The holder discharges any party to the instrument to the extent that without such party's consent the holder
* * * * * * * *
(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.
Section 3-606(1)(b) was added to the Code to incorporate the duty of care imposed by § 9-207 into Article 3. See U.C.C. *125 § 3-606, Comment 5. The chief purpose of the rule is to guard the surety's right to subrogation and the benefits which flow from it. This right is an equitable one and allows the surety to assert the rights of the creditor against the debtor. It has been observed that "[s]ection 3-606 is probably the most important provision in the Code to surety." Clark, Suretyship in the Uniform Commercial Code, 46 Tex.L.Rev. 453, 457 cited in Langeveld v. L.R.Z.H. Corp., 74 N.J. 45, 50 (1977). Thus, if the creditor handles the collateral carelessly so that its value is diminished the surety can claim discharge under this section. "These principles are based on the notion that any action by the creditor that increases the risk of the surety alters the surety's agreement and should thereby release him." Alderman and Dole, A Transactional Guide to the Uniform Commercial eCode, 623 (2 ed. 1983).
Langeveld v. L.R.Z.H. Corp., 74 N.J. 45 (1977) is the only case in New Jersey which directly addresses the issue of the effect of the particular language of a guaranty on a guarantor's right to unimpaired collateral. There a corporation delivered to the lender, Langeveld, a promissory note in the sum of $57,000. The debt was secured by a mortgage on land owned by the corporation. The mortgage was junior to two other mortgages on the same tract. In addition, defendant Higgins signed a guaranty agreeing to become individually liable for the repayment of the debt.
The guaranty read in relevant part as follows:
To induce the said JOHN P. LANGEVELD to accept the above note, the undersigned hereby guaranty performance of all obligations of the obligors under the note and under the mortgage securing the indebtedness described in the note. The said undersigned guarantors agree to be principally liable on the indebtedness jointly and severally and further agree to their obligation jointly and severally without the necessity of presentment, demand or notice of dishonor.
The undersigned guarantors agree to pay the tenor of this instrument notwithstanding that L.R.Z.H. CORPORATION may effectuate an assignment for the benefit of creditors, be declared a bankrupt, be discharged from Bankruptcy, or otherwise be excused, except by payment, of the debt. [Langeveld, supra, 74 N.J. at 52-53, n. 4.]
*126 Within a year the note fell into default. Thereafter, Higgins, the surety, discovered that the mortgage had never been recorded and he immediately did so. In the interim, however, three other liens had become a matter of record. The lender then sued on the guaranty seeking to recover the obligations under the note from Higgins. In defense, Higgins pointed out that a tripartite suretyship arrangement existed. As a result, he asserted that since the creditor, Langeveld, held the mortgage as collateral, it owed him a duty, as a surety, to protect the collateral and allow nothing to occur to impair its value. The intervention of senior liens due to the creditor's failure to immediately record, he argued, proved that Langeveld did not fulfill its duty. Thus, he claimed that pursuant to N.J.S.A. 12A:3-606 he should be discharged from all personal liability under the guaranty.
In upholding the guarantor's claims the court reiterated the importance of N.J.S.A. 12A:3-606 to the surety:
Upon paying the debt, the surety is, as a matter of law, subrogated to all the creditor's rights against the principal debtor and is entitled to all benefits derivable from any security of the principal debtor that may be in the creditor's hands. The rule forbidding impairment of collateral has as its chief aim the protection of these potential benefits made available through subrogation. [Langeveld, supra, 74 N.J. at 51, 376 A.2d 931, See also Bank of New Jersey v. Pulini, 194 N.J. Super. 163, 166, 476 A.2d 797 (App.Div. 1984)]
With these principles in mind the court found that failure to record a mortgage is clearly an instance of unjustifiable impairment.
It then addressed Langeveld's claim that by signing an unconditional guaranty, Higgins waived his right to unimpaired collateral. Ordinarily, an unconditional guaranty permits the creditor to move against the guarantor without first acting against either the collateral or the principal debtor. It does not contemplate rights in the creditor beyond these:
It is one thing to say that a creditor need not pursue the collateral as a condition precedent to pursuing the guarantor of payment and quite another to say that because of this condition precedent the creditor can by misfeasance or nonfeasance prevent the guarantor of payment from ever recovering from the collateral. Murray, Secured Transactions  Defenses of Impairment and *127 Improper Care of Collateral, 79 Com.L.Jour. [265] 278 [1974]. [Langeveld, supra, 74 N.J. at 54]
Recognizing that the creditor's interpretation of the guaranty would essentially eviscerate Higgins' right to subrogation, the court in Langeveld opined that such a result "should be permitted only where the instrument of guaranty specifically frees the creditor from liability for such impairment." Id. at 53. Accordingly, the court enunciated the rule that when faced with the claim that a guaranty was meant to eradicate every right of a guarantor and grant the creditor absolute immunity as to the collateral, a court must strictly construe the language of the guarantee. Citing D.W. Jaquays & Co. v. First Security Bank, 101 Ariz. 301, 419 P.2d 85 (1966) the court stated "[i]f the destruction, or impairment of such a right [subrogation to unimpaired collateral] is to be waived by the guarantor, it should only be by the most unequivocal language in the guaranty agreement. The right does not originate in contract, and it cannot lightly be destroyed by contract." Langeveld, supra, 74 N.J. at 53-54. In determining that Higgins did not forego his right to unimpaired collateral by signing the guaranty, the court in Langeveld concluded:
[t]he point to be made and emphasized is that absent express agreement, waiver or renunciation, a surety's right of subrogation to unimpaired collateral will be protected. We do not find this right to have been waived or relinquished by anything contained in this guaranty. [at 53 (emphasis in original)]
The language in the SBA guaranty signed by Gewertz is far more detailed and specific than that in Langeveld. In particular it first "unconditionally" guaranteed payment of the note entered into between the SBA and Winslow:
In order to induce Lenape State Bank (herein called "Lender") to make a loan or loans or renewal or extension thereof, to the Winslow Corporation (hereinafter called "Debtor"), the Undersigned hereby unconditionally guarantees to Lender ... the due and punctual payment when due, whether by acceleration or otherwise ... of the principal of and interest on and all other sums payable, or stated to be payable with respect to the note of the Debtor.... As security for the performance of this guaranty the Undersigned hereby mortgages, pledges, assigns, transfers and delivers to Lender certain collateral.... The term "collateral" as used herein shall mean any funds, guaranties, agreements or other property or rights or interests of any nature whatsoever, or the proceeds *128 thereof, which may be, are, or hereafter may be, mortgaged, pledged, assigned, transferred or delivered directly or indirectly by or on behalf of the Debtor or the Undersigned ... as security, whether immediate or underlying, for the performance of this guaranty or the payment of the liabilities .. . [emphasis added]
In Langeveld, the court cited nearly identical language as an example of an effective absolute guaranty. 74 N.J. at 54. Moreover this SBA guaranty, in effect, waives specifically broad substantive rights of the guarantor:
The Undersigned waives any notice of the incurring by the Debtor at any time of any of the liabilities, and waives any and all presentment, demand, protest or notice of dishonor, nonpayment, or other default with respect to any of the liabilities and any obligation of any party at any time comprised in the collateral. The Undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the Undersigned, ... to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers:
* * * * * * * *
(d) To consent to the substitution, exchange, or release of all or any part of the collateral, whether or not the collateral, if any, received by lender upon such substitution, exchange, or release shall be of the same or different character or value than the collateral surrendered by lender;
(e) In the event of the nonpayment when due, whether by acceleration or otherwise, of any of the liabilities, or in the event of default in the performance of any obligation comprised in the collateral, to realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interests as Lender may elect, at any public or private sale or sales ... without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the Undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise ... all as Lender in its uncontrolled discretion may deem proper and to purchase all or any part of the collateral for its own account at any such sale or foreclosure ...
* * * * * * * *
... The Undersigned shall have no right of subrogation whatsoever with respect to the liabilities or the collateral unless and until Lender shall have received full payment of all the liabilities.
* * * * * * * *
The obligations of the Undersigned hereunder, and the rights of Lender in the collateral, shall not be released, discharged or in any way affected, nor shall the Undersigned have any rights against Lender.... nor by reason of the fact that any of the collateral may be subject to equities or defenses or claims in favor of others or may be invalid or defective in any way ... nor by reason of the fact that the value of any of the collateral, or the financial *129 condition of the Debtor or of any obligor under or guarantor of any of collateral, may not have been correctly estimated or may have changed or may hereafter change ... [emphasis added]
In our view, the language of the SBA guaranty in this case meets the standard of an unequivocal waiver under Langeveld thereby making Gewertz an absolute guarantor.
This does not end the inquiry. By the terms of the guaranty the obligations of Gewertz as a guarantor are discharged where any
deterioration, waste or loss [to the collateral] is caused by the willful act or willful failure to act of Lender. [emphasis added]
Here Gewertz asserts that the trial judge erroneously granted summary judgment in favor of Lenape because there were genuine issues of material fact; in particular, whether Lenape willfully and intentionally interfered with the sale of Winslow to Salkow and willfully allowed the lease with Wilson and Stevens to remain in default. Although as Lenape correctly asserts, the terms "willful" and "intentional" were not contained in Gewertz's answer to the complaint, we think this issue was adequately before the trial judge. Gewertz's answer claimed impairment of collateral. His certification in opposition to Lenape's motion for summary judgment directly claimed "willful" and "intentional" conduct by Lenape. In addition, the issue was addressed at the motion for summary judgment at which both sides argued the substance of the willfullness claim. Overall we are satisfied that this issue was considered by the trial judge and that it is properly before us and we agree with Gewertz that the willfulness claim presented a genuine issue of material fact requiring adjudication after a trial. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954). We thus remand the matter to the trial judge for a resolution of this narrow issue.
Gewertz's final claim is that after default Lenape disposed of the collateral in a commercially unreasonable manner contrary to N.J.S.A. 12A:9-504(3). At the heart of this claim is his argument that a guarantor is a debtor within the meaning of *130 N.J.S.A. 12A:9-504(3) and N.J.S.A. 12A:9-105(1)(d). As such, he asserts that he is entitled to raise the defenses contained in these sections. In addition, Gewertz argues that since a guarantor is a debtor within the terms of Section 9-504(3), he, like the debtor, cannot waive his rights to notice and a commercially reasonable sale as mandated in that provision. As might be expected, Lenape argues that a guarantor is not a debtor within the meaning of Sections 9-504(3) and 9-105(1)(d) and that even if a guarantor falls within these provisions the anti-waiver provision in Section 9-501(3)(b) would not be applicable to a guarantor. Both parties have extensively cited and summarized federal cases, which primarily apply the particular state's U.C.C. A review of these decisions indicates that the courts are almost evenly split in resolving these issues. Cf. United States v. Kukowski, 735 F.2d 1057 (8th Cir.1984); First National Park Bank v. Johnson, 553 F.2d 599 (9th Cir.1977) holding that a guarantor can waive a defense of commercial reasonableness with Ford Motor Credit Co. v. Lototsky, 549 F. Supp. 996 (E.D.Pa. 1982) and United States v. Willis, 593 F.2d 247 (6th Cir.1979) holding that such a defense is nonwaivable).
These questions have not yet been addressed in New Jersey nor will they be here. This is so because N.J.S.A. 12A:9-501(4) provides:
If the security agreement covers both real and personal property, the secured party may proceed under this Subchapter as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect to the real property in which case the provisions of this Subchapter do not apply.
As the comment to this section indicates, this provision was added "[i]n the interest of simplicity and speed." In essence, it means the secured party can proceed against personal property under the U.C.C. and real property pursuant to the real property law of the state or, in the alternative, the secured party can proceed against the real and personal property together under the real property law of the state, in which case the U.C.C. does not apply at all. See e.g., Petz v. Estate of Petz, 467 N.E.2d 780 *131 (Ind. App. 3 Dist. 1984); State Bank of Towner v. Hansen, 302 N.W.2d 760 (N.D. 1981). If the secured creditor chooses to proceed in separate actions the default provisions of the U.C.C. apply with regard only to the personal property collateral. Hildner v. Fox, 17 Ill. App.3d 97, 308 N.E.2d 301 (1974).
Here Lenape proceeded to dispose of the real and personal property of Winslow in a single foreclosure action. As a result, New Jersey real property law and not the U.C.C. is applicable to determine whether Gewertz was entitled to commercial reasonableness in the sale of the collateral.
Gewertz asserts that Lenape's actions in connection with the sale violate the real property law of the state insofar as N.J.S.A. 2A:50-2 provides:
Where both a bond and a mortgage have been given for the same debt, all proceedings to collect the debt shall be:
First, a foreclosure of the mortgage; and
Second, an action on the bond for any deficiency, if, at the sale in the foreclosure proceeding, the mortgaged premises do not bring an amount sufficient to satisfy the debt, interest and costs.
* * * * * * * *
No action shall be instituted against any person answerable on the bond unless he has been made a party in the action to foreclose the mortgage.
On its face, Gewertz's reliance on this statute is misplaced because this case involves a note and not a bond. This is the gravamen of the holding in 79-83 Thirteenth Ave, Ltd. v. DeMarco, 44 N.J. 525 (1965) where the statute, and its protections, were interpreted to apply only to debts evidenced by a mortgage and a bond, not those involving a note. Characterizing this distinction as "illogical, incongruous and ... [a] triumph of form over substance" the court in DeMarco stated:
the change will have to come from the Legislature, and, as the Appellate Division in this case and the knowledgeable local authorities it quoted have so *132 well pointed out, the subject deserves prompt attention by that branch of government. [at 530 (citations omitted)].[2]
In May of 1980 the Legislature finally amended N.J.S.A. 2A:50-2 et seq. eliminating, in most instances, the favorable treatment bestowed upon bonds. Thus, receiving notice and obtaining credit for the fair market value of mortgaged property sold on foreclosure is now applicable whether the mortgage debt is evidenced by a bond or a note. However, N.J.S.A. 2A:50-2.3 carves out an exception:
This act shall not apply to proceedings to collect a debt evidenced by a note and secured by a mortgage on real property in the following instance:
a. Where the debt secured is for a business or commercial purpose other than a two-family, three-family or four-family residence in which the owner of his immediate family resides [emphasis added]
Because Gewertz's claims flow from a commercial transaction, the protections afforded note holders under the 1980 amendments are not applicable.
The only other arguably relevant basis for Gewertz's claims is N.J.S.A. 2A:50-22 which provides that one may not enforce an agreement to assume or guarantee the payment of any note secured by a mortgage unless the party making such an agreement is made a party defendant in the foreclosure action, and the plaintiff has joined in the action "any and all persons ... alleged to be liable upon the note ... or any moneys alleged to be due thereon, as principal, guarantor, surety or otherwise ..." This amendment to the statute, however, only applies to notes given after its effective date. (L. 1979, c. 286, amending Title 2A, chapter 50). Because the note here was executed on June 2, 1977, it is inapplicable.
*133 Separate and apart from the issue of the absence of a statutory base for Gewertz's post-default claims, we note again that the SBA guaranty, which we have previously addressed, specifically waived Gewertz's post-default rights as to the disposition of the collateral. Since no claim of willfulness is advanced by Gewertz as to Lenape's actions in connection with the sale of the collateral, no fact question attends the resolution of this issue which was thus properly disposed of by the judge at the summary judgment motions.
Affirmed in part; reversed and remanded in part.
NOTES
[1] Lenape also incurred cost of sale of $57,445.18 and legal fees and costs in the amount of $18,646.14.
[2] A prompt legislative response, however, was not forthcoming and a later New Jersey Supreme Court case again took issue with the artificial and illogical distinctions created by the statute:

We continue to believe, as set forth at length in DeMarco that the present differentiation as between note-mortgagors and bond-mortgagors is illogical and what is worse, unfair. We also continue to believe that legislation affords the best recourse and to this end we again invite legislative consideration of this problem. [Schwartz v. Bender Investments, Inc., 58 N.J. 444, 448 (1971)]