**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0896-22

TD BANK, N.A., SUCCESSOR
BY MERGER TO COMMERCE
BANK/NORTH AND SUCCESSOR
BY ASSIGNMENT TO TD
EQUIPMENT FINANCE, INC.,

     Plaintiff-Respondent,

v.

FARRENDALE INVESTMENTS,
LLC, f/k/a FARRENDALE
PROPERTIES, LLC, JOHN E.
BAILYE, LYNDALL J. BAILYE,
KOOKABURRA AIR, LLC, and
KOOKABURRA CHARTERS, LLC,

     Defendants-Appellants.

_____

Submitted March 13, 2024 – Decided August 1, 2024

Before Judges Accurso, Vernoia and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2058-19.

Law Offices of Steven A. Varano, PC, attorneys for appellants (Joseph P. Slawinski, Alan Kraminsky, Albert Seibert and Justyna Karbarz, on the briefs).

Saldutti Law Group, attorneys for respondent (Andrew P. Chigounis, on the brief).

PER CURIAM

Defendants Farrendale Investments, LLC, John E. Bailye, Lyndall J. Bailye, Kookaburra Air, LLC, and Kookaburra Charters, LLC appeal from a $1,870,802.81 judgment in favor of TD Bank, N.A. entered after a fair market value hearing following a residential mortgage foreclosure. They also appeal from the dismissal of their counterclaims for breach of the covenant of good faith and fair dealing, and violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -229, and the deficiency statutes, N.J.S.A. 2A:50-2 to 2A:50-10 and 2A:50-22 to 2A:50-28.

We affirm the trial court's rulings that the case comes within one of the exceptions to the deficiency statute and that plaintiff's post-sale costs to be added to the amount due are limited to the $16,430.40 it actually expended. But we reverse the judgment and remand for a new fair market value hearing because we conclude at least two unsound pretrial orders deprived defendants of relevant discovery and unfairly prejudiced them at trial. We also reverse the dismissal of defendants' counterclaims for breach of the covenant of good

2

faith and fair dealing and the Consumer Fraud Act because defendants stated causes of action for both and should be permitted the opportunity to establish them on remand.

In light of our disposition of the appeal, we confine ourselves to what we understand to be the undisputed facts. John and Lyndall Bailye bought their home, Cragwood, a Georgian Revival mansion built in the 1920's and now a 112-acre estate in Somerset County, in 1996 for $4,450,000, with funds borrowed from the Bank of New York. The Bailyes took title in the name of Farrendale Properties, LLC, a single-asset limited liability company, whose members were the Bailyes and two trusts for their children.[1] The estate consists of a 16,156 square foot residence having eleven bedrooms, nine full bathrooms, three half bathrooms, thirteen fireplaces, an elevator, a full, furnished basement with a wine cellar, a gym and a media room. The property also boasts a 2,600 square foot pool house, a 676 square foot cottage, which functions as a game room, a two-story office with several staff apartments, a 715 square foot stable and kennels, two maintenance barns and a four-car garage. Other amenities include a gated security fence, an in-ground pool, fountain, gardens, and a tennis court. There is a working farm on the estate,

---

[1] Farrendale Properties is now known as Farrendale Investments, LLC.

which is, in part, farmland assessed. The property is situated on Bernardsville Mountain, straddling Far Hills and Bernardsville, and enjoys unobstructed views of the surrounding countryside and Ravine Lake.

The Bailyes refinanced the property in 2003 with plaintiff's predecessor Commerce Bank. They also obtained from Commerce a $2 million line of credit for renovations and general upkeep, secured by a second mortgage on Cragwood. The Bailyes personally guaranteed both debts. In 2007, the Bailyes, through Kookaburra Air, LLC, borrowed another $6.4 million dollars from a Commerce entity to purchase an airplane for the family's personal use.[2] In addition to an aircraft security agreement in favor of Commerce, the Bailyes and Farrendale guaranteed payment of the aircraft loan. In 2011, Farrendale gave Commerce a third mortgage on Cragwood to secure the obligations of Kookaburra Air. Plaintiff TD Bank has succeeded to Commerce's interest in those loans either through merger or assignment.

In 2015, the Bailyes relocated their family to England, although intending to return to Cragwood in the future. The estate remained fully furnished with a full-time staff that maintained the home, grounds and farm. The following year, however, the Bailyes faced financial difficulties and listed

---

[2] Kookaburra Air was formerly known as Kookaburra Charters, LLC.

A-0896-22

Cragwood for sale for $24 million. They dropped the price to $23 million in 2017 and attempted, without success, to negotiate amended payment terms with the bank.

In February 2018, the Bailyes secured a $1,929,000 offer from a neighbor for a seventeen-acre parcel, part of the Cragwood Estate but a separate lot purchased after the Bailyes' initial purchase of the property. The bank refused to approve the sale, apparently believing a better price could be secured by not breaking up the estate. The neighbor remained interested, eventually signing an agreement with the Bailyes to purchase the lot for $1.5 million cash with no contingencies and closing in thirty days.

The Bailyes failed to make their mortgage payments due March 1, 2018, and the bank declared them in default. The bank secured an appraisal from Tony F. Kamand, Jr., MAI, valuing Cragwood as of February 28, 2018, at $16.8 million using a comparable sales approach. The bank shared Kamand's appraisal with the Bailyes, after which they dropped Cragwood's listing price to $16.5 million. The bank served the Bailyes with a notice of intent to foreclose in April and filed its residential foreclosure complaint in June. John Bailye testified defendants did not contest the foreclosure, in part because they expected surplus funds from the sale based on the Kamand appraisal, and

5

instead focused their funds on maintaining the estate to position it for the best sale price.

In October 2018, while the foreclosure was pending, the Bailyes attempted to sell Cragwood, less the seventeen-acre parcel, through an auctioneer. Although the auctioneer had represented to both the Bailyes and the bank that its solicited pre-bids for the property were minimum bids and it expected the hammer price would be fifty to ninety percent higher, Bailye testified the bank refused to permit the auction to go forward when the highest pre-bid was only $5 million, $4 million lower than the bank's $9 million floor. The bank disputes that account and contends Bailye called off the auction.

The bank obtained final judgment in foreclosure in January 2019, with the court setting the amount due on the mortgages at $7,780,080.54. The bank obtained another appraisal shortly before the sheriff's sale. Peter Sockler, relying on different comparable sales than Kamand had, opined the fair market value of Cragwood, including the seventeen-acre parcel, was $6,650,000 as of March 5, 2019, more than $10 million less than the bank's appraisal from the year before. The property was struck off to the bank at sheriff sale for its bid

6

of $1,000 on March 12, 2019.[3] Following the sheriff's sale, the property was "transferred" to the bank's "other real estate owned" (OREO) asset management department, on March 28, 2019, where it was overseen by Carol Farnsworth, an asset manager located in South Carolina.

The neighbor with the $1.5 million contract for the seventeen-acre lot quickly renewed his offer to Farnsworth, who refused to consider it out of concern the sale of that parcel would landlock the estate. The Sockler appraisal, however, recommended the seventeen acres be sold separately from the rest of the estate. Sockler performed a separate appraisal for that parcel, which he valued at $1 million, notwithstanding the neighbor's all cash offer of $1.5 million, with no concern its sale would landlock the estate. The bank now concedes the contract with the neighbor would have not landlocked the estate. Farnsworth was aware of the Kamand appraisal the bank had from the year before, although she had apparently never reviewed it. She testified at her deposition, and confirmed at trial, that she was not surprised the 2019 Sockler

---

[3] At the time of Kamand's inspection on February 28, 2018, Kamand opined the condition of the property was good and there was no deferred maintenance. The estate at that time remained fully furnished and staffed, as it did through the end of 2018. Bailye testified he could not ultimately continue to both pay the mortgages and maintain the estate, the latter of which he estimated to cost between $125,000 and $150,000 per month. In February 2018, he made the choice to default on the mortgages and maintain the property.

<span>A-0896-22</span>

appraisal was $10 million less than the appraisal from the year before "because the market demand had changed significantly" for "this type of property."

Defense counsel attempted to explore with Farnsworth whether it was customary for the bank to undertake a review to reconcile discrepancies in appraisals but was not permitted to explore the topic with Farnsworth because the court had granted the bank's in limine motion excluding the Kamand appraisal and any reference to it because "defendant[s] did not formally name Kamand as an expert."

The judge acknowledged the Kamand appraisal was the bank's document, a business record, provided to the Bailyes prior to the institution of foreclosure "and informational, I guess, for the bank when they got it," and it "was done as part of — in the issues of collateralization and, I guess, these kinds of things. But nonetheless, that expert was not properly named." The trial judge ruled "there are experts and the matter should proceed in that fashion that I hear from the appropriate remaining experts for either party," and "despite the fact that it's an internal document of the plaintiff," the judge "preclude[ed] the use of the Kamand report" for any purpose, including cross-examination. Thus, although Farnsworth testified the bank had policies and procedures for reconciling disparate appraisals and followed them here, they

8 A-0896-22

were never produced to defendants in discovery, and the Kamand appraisal was barred for all uses at trial.

Farnsworth testified she had solicited a broker, Peter Sideris, when the property came to the OREO department in late March 2019, who recommended that it be listed at $9.95 million, with the expectation that it would sell in three to six months for between $8-to-$8.5 million. A proposal from another broker was similar, opining, based on included comparable sales, that the estate could be sold for $9 million. The bank, however, did not list Cragwood with a broker. And although Farnsworth testified the bank had written procedures for managing OREO assets after a sheriff's sale and developing a "disposition plan" for the property, the bank refused to produce those written procedures in discovery, contending they were trade secrets. The court agreed, although there were no certifications or testimony from any witness explaining why the documents were trade secrets. The court rejected defendants' offer that the documents be produced pursuant to protective order. We denied defendants' application for leave to appeal that ruling.

In any event, no disposition plan was created for Cragwood. Instead, Farnsworth received an offer of $6,650,000, the exact sum of the Sockler appraisal, from a local investor/developer, Peter J. Cocoziello, Jr., within a

9

week or so of the transfer of the property to the OREO department. Farnsworth countered Cocoziello's bid with a price of $7.5 million and, within three weeks of assuming management of the property, executed an "as is" contract on behalf of the bank with Cocoziello on April 19 for all of Cragwood, including the seventeen-acre parcel, for $6.8 million.

The following month, the bank filed its deficiency action against defendants seeking the amount due on the mortgages, $7,780,080.54, less a fair market value credit of $6,100,000, reduced by "a holding and overhead charge of 20%," or $1,220,000, notwithstanding its actual expenses amounted to only $16,430.40, for a fair market value credit of $4,890,000, and a total due of $2,890,080.54. Defendants answered and counterclaimed for breach of the covenant of good faith and fair dealing and violations of the Consumer Fraud Act claiming the bank failed to act in good faith, to take measures to obtain the highest sale price for the property and to otherwise mitigate any purported damages and had also violated the deficiency statute.[4]

---

[4] The court granted summary judgment on the counterclaims for breach of the covenant of good faith and fair dealing and the Consumer Fraud Act based on its understanding that there were no independent causes of action for such claims, and the only relief available to defendants was a fair market value credit.

A-0896-22

Prior to the scheduled closing on Cragwood, Cocoziello undertook another inspection of the property and presented the bank with a list of thirty-nine "issues" that required "remedy" with a rounded cost for each. The issues ranged from "rewir[ing] commercially controlled entry locks on all doors and program to new owner" at a cost of $8,500 and "replac[ing] two removed refrigeration units in butler's pantry" at a cost of $13,000, to $1,250,000 to "remove and remediate nine underground oil tanks" and "examine four old above ground oil tanks" assuming "that not all tanks are leaking" and $350,000 to "replace two existing 1920's era cesspools" with "two 3,500 gallon septic systems and fields with leach area and necessary lines from principal and accessory structures." There was no indication of who prepared the list or estimated the costs to remedy the alleged problems. Cocoziello presented no supporting documentation and no environmental studies to the bank to support his claims.

After receiving Cocoziello's list, Farnsworth wrote to her supervisors, saying:

> Attached above is a list of issues that the buyer plans
> to address resulting from his due diligence, totaling
> $2,952,020. Buyer understands he agreed to the
> purchase price as is for $6.8 million. However, the
> scope of issues are larger than he could have

11

imagined, with special attention to the discovery of two cesspools and nine underground oil tanks.

My suggestion is to offer 6.2 million and settle on a range of 6 million to 6.2 million. A $6 million sale is 88 percent of the appraised value and would produce a [gain on sale] of approximately $660,000. The bank doesn't pay a commission. The book balance is $5,319,999.99. I recommend we find a way to work with this buyer since there are so many unknowns. If we lose the buyer, we incur the risk of losing the current farmland assessment and the need to pay rollback taxes for future sale. It would be necessary to disclose our knowledge of the existence of the underground oil tanks and cesspool to future buyers who inspect with this kind of purchase price. The likelihood is good that as seller, we would be required to abandon the cesspool since they are illegal in New Jersey.[5]

---

[5] The bank's representatives who testified at trial, including one of the supervisors to whom Farnsworth directed her email, claimed they were not aware of a letter counsel for defendants wrote to the bank's counsel on February 21, 2019, shortly before the sheriff's sale, transitioning the property from the care of the Bailyes to the care of the bank and warning of the consequences to the estate of shutting off electric power and heat. That letter also states:

Farrendale has used its last funds to fill oil tanks for heating purposes. That oil is likely close to running out at this time and there are no funds to pay any more. There are more than 12 oil tanks. And Farrendale has at all times maintained insurance on the tanks to protect in the event of rupture/ environmental damage. There are no funds to pay such insurance when it lapses in March.

12

The bank sold the property to Cocoziello for $6 million in the second week of July 2019. Farnsworth testified on cross-examination that she made no effort to confirm any of the items on Cocoziello's list and specifically that she had no confirmation from anyone as to the existence of the cesspools or underground oil tanks.

One of Farnsworth's supervisors, Nicholas Penfield, testified Cragwood "was the highest valued property we had — residential property — that we had ever booked in OREO." He explained the several risks to the bank of "holding the property," including that the farmland assessment "tax savings tool was due to expire in August." He testified that if the bank "were unable to close this deal prior to August — and really, we would need to close it in July because we would have to, you know, go through the process of renewing the assessment — we were going to be subject to some very significant real estate taxes." He added, "[a]nd if we owned this longer, we could be subject to those real estate taxes, you know, annually, obviously."

Penfield also testified to the bank's concerns about possible liability for environmental contamination relating to the underground storage tanks and cesspools, of which he claimed the bank was not aware prior to Cocoziello's

13

list.  He testified he had never "seen or heard of a cesspool" before.[6]  In addition to having to disclose the information to potential purchasers, Penfield testified they presented a risk to the bank "of holding the property.  You know, with these kinds of issues, you just don't know the unknowns that can happen."

Penfield testified all the bank "needed to do [was] just validate" the existence of the problems, not necessarily the remediation costs, in order to justify negotiating a reduction of the contract price with Cocoziello and that the bank was "able to validate the riskiest items," that being the cesspools and the tanks.  Penfield, however, could not say how the bank verified the existence of those "riskiest items," and testified it was not "a normal process for [the bank] to get a phase 1 environmental on a residential property" and the bank did not do so here.  He also conceded, however, that Cragwood was not "a normal residential property."

Penfield testified it was his job "as a manager overseeing this stuff," "to make sure" people like Farnsworth were "doing their job according to the policies and procedures of the bank."  And from his perspective, Farnsworth

_____

[6]  More seriously, defendants' appraiser testified he didn't know the difference between a cesspool and a septic tank, believing them the same thing, i.e., a private sewage system that required evaluation by an environmental professional in order to be included in a valuation opinion.

"did a great job because we sold the property for appraised value in just a couple months.[7] So our costs to hold were de minimis," and "[w]e saved the expense of using a broker."

As to the twenty percent "holding and overhead charge" of $1.22 million the bank sought to collect from defendants, Penfield testified it represented the amount by which the bank had discounted the book balance of the loan when the property was transferred to the OREO department. "That twenty percent number is a number that we have studied over the years and represents . . . three expense items . . . : the holding costs, the closing costs, and write-downs." According to Penfield, that calculation is based on guidance from the bank's chief regulator, the Office of the Comptroller of the Currency, on "the accounting principles that national banks should follow in terms of recognition and accounting of OREO. So basically what they say here is you should recognize OREO, you know, based on the value, less estimated cost to sell," that is the holding costs, the closing costs and the write-downs.

---

[7] The bank actually sold the property for $650,000 below Sockler's appraised value. In his initial appraisal, Sockler valued the property at $6,650,000. He didn't reduce his estimate of the value until preparing an updated report, albeit with the same evaluation date, for the litigation.

15

A-0896-22

Penfield testified the bank "on an annual basis" reviews its expenses, "and we measure those expenses against what our appraised values are of the real estate. And that's how we come up with the twenty percent. Some years it's higher, some years it's lower," but the change "tends not to be material."

On cross-examination, Penfield admitted the total costs the bank had incurred in holding Cragwood were $16,430.40, but explained the bank "view[s] the twenty percent . . . as a portfolio-wide situation. So the time that we held the property in this case was much lower than our average hold time, which is typically around nine months to a year-and-a-half." Penfield acknowledged "the twenty percent is not specific to our actual damages. It's an assessment of, you know, the way the math works for the entire portfolio." That led to the following exchange:

> Q: So you're taking an accounting principle that lets
> you deduct twenty percent for accounting purposes
> and using that as an attempt to justify reducing a
> borrower's [fair market value] credit by twenty
> percent, even though the bank didn't spend anywhere
> near that amount to secure a property?
>
> A: The same way we would if the actual expenses
> exceeded twenty percent. You would still do twenty
> percent.

Following that exchange, defendants' counsel made an oral motion to amend their pleadings to conform to the evidence, reinstating the Consumer

16

Fraud Act claim. The judge denied the motion, finding the issue had already been thoroughly litigated, with the court "[o]n three separate occasions" dismissing the Consumer Fraud Act claims. The court made clear it would decide whether the bank was entitled to the twenty-percent charge but would not overturn the decisions of two other judges dismissing the consumer fraud counterclaim.

Sockler updated his prior appraisal for this litigation in October 2020, holding the March 5, 2019 effective date, "to consider the impact of environmental contamination," assuming the property was "similar in condition as during [his] previous inspection." In his updated report, Sockler relied on the bank's sale to Cocoziello, and its downward negotiated price. Acknowledging that "[t]he concluded market value in [his initial] March 5, 2019 report is higher than the concluded market value in this report," Sockler explained that was "primarily due to the additional information provided to us by our client, regarding the 2019 sale and the condition of the property as communicated to [Sockler] by [a] representative of TD Bank."

Updating his comparable sales and making additional adjustments to previously identified comparables — including for such presumably static items as location and size in a continuing "strong" market — Sockler dropped

A-0896-22

the value of Cragwood without the seventeen-acre parcel to $5,410,000, from $5,650,000. He also dropped the value of the seventeen-acre parcel from $1,000,000 to $750,000, notwithstanding Bailye had a signed contract for its sale at $1,500,000 on the evaluation date. Accordingly, Sockler revised the value of the estate downward from $6,650,000 to $6,160,000 in the appraisal he completed for use in the litigation. From that figure, he deducted $800,000, equaling the sum Cocoziello had been able to negotiate off his "as is" contract price of $6,800,000.

Sockler explained the $800,000 reduction, which he testified "did not figure into value," in the sections of his report entitled "analysis of recent subject sale" and "environmental impacts." The updated report states:

> TD Bank never listed the property for sale with a broker or on an auction site. The buyer, who lived locally to the subject property, reached out to TD Bank and expressed interest in purchasing the property. The buyer scheduled a site inspection and after the inspection made a cash offer of $6,800,000. Several areas of concern were discovered during the buyer's inspection. Some items include cracked plaster, broken pipes that created wall damage, tennis court paving and the pool and fountain had not been winterized. The $6,800,000 offer represents an all cash sale, with no commission and noting the As Is condition of the property including the areas of concern observed at the inspection. However, upon a follow up inspection more than 10 Underground Fuel Tanks (UFTs) were discovered in areas across the

18

subject property site, including one tank near the river frontage.  In addition to the UFTs, the inspection uncovered two illegal cesspools including one that was overflowing and seeping into the surrounding soil.[8]  Carol Farnsworth indicated that it is <u>not customary to order an environmental report for single-family dwellings and to the best of our knowledge no environmental report has been completed at the subject property</u>.  She also indicated that it was her opinion, due to the environmental issues, the property was not financeable and only a cash deal would have been successful.  Finally, due to the extended vacancy at the subject property the buyer had difficulty obtaining an insurance policy.  According to Carol Farnsworth[,] the buyer was required to pay an upfront fee of $50,000 in order to obtain liability coverage.  The buyer closed in July 2019 and reportedly moved in, in the middle of November 2019.  It is the buyer's intention to fix up the property and live there with his family.

Noting all of the above, the buyer negotiated an $800,000 reduction in sale price, due primarily to the existence of the UFTs and the two cesspools that were overflowing and leaking into the soil.  Both of these factors have environmental implications.  It is our understanding that <u>the buyer has not remediated these issues</u> and the work is ongoing and being addressed as needed and over time.  We have not been provided with cost estimates for the necessary work.  The buyer provided a list of noted issues at the subject property

---

[8]  It is unclear where Sockler obtained the information that one of the cesspools was "overflowing and seeping into the surrounding soil."  He testified he did not observe it, and that information was not included in the list from Cocoziello.  Sockler testified the information came from "the bank," but neither bank representative testified to the condition of the cesspools Cocoziello alleged were on the property.

to the bank.  The list included costs for each issue. These costs did not include formal estimates from licensed professionals, and we are not aware of how the costs were determined.  Therefore, we have not utilized these costs to determine value in our appraisal report.  It is our opinion that the negotiations between the buyer and seller, which included several offers and counteroffers, and were based on the knowledge of the environmental issues, are an accurate representation of how market participants react to negative attributes of a property.  As such, we have subtracted $800,000 from our previously concluded market value of the subject property in order to estimate a market value of the subject property, duly noting its required environmental remediation for an indicated market value of $5,360,000.

[(First emphasis in original, the remainder supplied).]

In his original appraisal, Sockler had stated "[t]here were no extraordinary items of deferred maintenance noted during [his] inspection of the property."

Defendants presented the December 2020 appraisal of Mario G. Carrico, who opined Cragwood had a value of $12,300,000 as of March 12, 2019. Although noting the possibility of the presence of underground storage tanks, which could certainly be a liability, Carrico did not take them into account because without "a detailed physical inspection of the tanks and the surrounding soil, it is impossible to estimate potential clean-up costs." Carrico's appraisal report advised "[t]he intended user" to have "qualified

20

experts . . . perform an inspection" of the property, with the appraised value being adjusted in accordance with the findings.

After hearing several days of testimony, the trial judge entered judgment for the bank in the sum of $1,796,510.94, the $7,780,080.54 amount due on the mortgages, less a fair market value credit of $6,000,000, the negotiated price between the bank and Cocoziello, or $1,180,080.54, plus its $16,430.40 in carrying costs.[9] The judge rejected the bank's claim for a twenty-percent "holding and overhead charge," finding no basis for it in the loan documents or the law. The judge found "[c]ollecting $1.2 million dollars on the foreclosure and sale of the property" would create "a windfall for the bank," to which it was not entitled. The judge subsequently awarded the bank a total of $74,241.87 in costs and attorney's fees for a total judgment amount of $1,870,802.81.

Based on the testimony of the bank's representatives, the judge was satisfied they "were motivated to sell the property for its best value in order to collect monies that the bank was due" and were not motivated "to sell the property rather quickly for an undervalued amount of money" notwithstanding

---

[9] The judge's calculation in the record is in error as he added the $16,430.40 in costs to the $6,000,000 fair market value credit instead of subtracting the sum.

its going under contract less than three weeks after being moved into the bank's OREO department. The judge further found the $6,000,000 sale price was "a correct assessment and appraisal" of the property.

Relying on Cornell Law School's online Wex legal dictionary, the judge defined "fair market value" as "[t]he price an asset would sell for on the open market when certain conditions are met. The conditions are the parties involved are [aware] of the facts, are acting in their own interest, are free of any pressure to buy or sell and have ample time to make the decision." The judge found the Cocoziello sale met those conditions, notwithstanding his crediting of the testimony of the bank's witnesses about their concern over the looming August 1 deadline to requalify for farmland assessment, "that the property could lose the farmland tax assessment benefit" and the bank "well might" have to pay the rollback taxes and "that the structural and potential environmental defects on the property were a source of concern and potential liability for the bank."

The judge found Sockler's "third and most updated appraisal" determined "the value of the property was $6,000,000 considering the potential environmental liabilities . . . consistent with the sale between Farnsworth and Cocoziello originally for the $6.8 million of credit then negotiated over the

environmental and structural deficiencies to $6,000,000."[10]  The judge noted

"[t]he parties were in agreement that Peter Cocoziello was an experienced real

estate investor and developer" and found the list he presented to the bank "was

not countered directly by the defendant[s]."  The judge rejected defendants'

argument that the court should not consider the Cocoziello list in considering

value because it lacked any support in the record.  Instead, the judge found

defendants "simply . . . argued that there was no documentary support or

investigation or studies made relative to the contentions on the list."[11]

    The judge also rejected defendants' argument that the bank had made

"insufficient efforts . . . to market the property and expose it to the open

---

[10]  That statement is inaccurate.  As already noted, in his "third and most updated appraisal" for use at trial, Sockler valued the estate at $5,410,000 without the seventeen-acre parcel, which he separately valued at $750,000, for a total of $6,160,000, from which he deducted another $800,000 "in order to estimate a market value of the subject property, duly noting its required environmental remediation." Thus, Sockler's final value was $5,360,000, not $6,000,000.  Sockler testified Cocoziello "overpaid" for Cragwood.  Moreover, when he evaluated the property for trial in October 2020, fifteen months after closing, and reduced its estimated value by the $800,000 Cocoziello had negotiated off the contract price, Sockler was aware "the buyer ha[d] not remediated" any of the alleged environmental issues.

[11]  This statement does not appear to be accurate.  Bailye testified at length about items on the list, conceding the existence of some, albeit maintaining they were routine maintenance issues regularly addressed, and vigorously refuting others, including any issues with the underground storage tanks.  No supporting documents were produced by other side.

23

market for an adequate period of time in order that it could be known by all potential buyers." The judge found Bailye's efforts "over the period of two to three years, as well as the efforts of the bank representative Farnsworth to market the property were more than adequate and — and certainly enough time to determine that the requested or the anticipated value of the property by the defendants was not real" and "no offer more than six million, despite aggressive marketing of this rather unique old estate." The judge did not address defendants and their expert's contention that defendants' earlier efforts to sell the property likewise did not properly expose it to the market because the estate was significantly overpriced at that time.

As to the seventeen-acre parcel, the judge found the bank "had no obligation . . . to carve out the lot . . . and no obligation to sell the property separate and apart from the overall estate" and rejected defendants' contention that the $1.5 million contract with the neighbor for that parcel "established a level of value." The judge noted that when the estate was "sold to Cocoziello," the seventeen-acre parcel was sold for a "greater amount of money [than the

neighbor] was offering and for all of those reasons, . . . the [seventeen-acre] lot was never sold."[12]

---

[12] The seventeen-acre lot was not sold when the bank declined the "no contingency, all cash" contract Bailye had negotiated with the neighbor for $1.5 million on the valuation date. Sockler, however, had already opined that the lot should be sold separately and valued it that way, although initially at $1 million because in his opinion, the neighbor was willing to overpay to protect his own property from neighboring development. Sockler dropped it out as a comparable sale in the appraisal he prepared for the litigation, reducing the value of that seventeen-acre parcel to $750,000, stating: "We have chosen not to rely on the subject sale [to the neighbor] as it does not appear to represent a standalone sale for a residential lot, and further, it was a bank sale and the first sale after foreclosure."

Sockler testified he did not consider it a "standalone sale" because the neighbor had made a subsequent offer to the bank to purchase the remainder of Cragwood for $4 million after the bank turned down the contract he'd executed with Bailye. As to the reference to the "bank sale and the first sale after foreclosure," Sockler testified Bailye "was under duress" when he negotiated the sale to the neighbor, "and it's something that wouldn't be used" in appraising value. Carrico agreed "the first sale after foreclosure is never deemed a fair market sale. Tax assessors will usually apply a non-usable code to the first sale after . . . foreclosure as a non-arm's length sale" and "the banks don't usually want to see that." Carrico, however, was explaining why he didn't take the bank's $6 million sale of the estate to Cocoziello into account in his assessment of fair market value.

As for the judge's statement that the bank sold the seventeen-acre piece to Cocoziello for more than the neighbor's $1.5 million contract, that was bank counsel's argument. The bank's expert, however, disagreed. Sockler testified the $1,565,000 purchase price listed in the Cocoziello deed for the seventeen-acre parcel had no relation to its value but was "merely something that Mr. Cocoziello's accountants allocated" to it out of the $6 million he paid for the entire estate.

25

The judge did not find defendants' expert Carrico "to be credible." The judge noted defendants' expert

> is not MAI certified and if the highest certification can't be received despite decades working as an appraiser who testified that he was still working on his MIA (sic) certification . . . the court wonders after all that time what the obstacle would be to his . . . getting the MIA (sic) certification, which apparently he is and has been pursuing.[13]

---

[13] The parties stipulated to the qualifications of both experts, so there is no voir dire on the record for either. In the course of exploring Carrico's background, defense counsel elicited that Carrico had conducted hundreds if not thousands of appraisals over the course of his thirty-year career and specialized in appraising properties valued at over $2-3 million in Essex, Middlesex, Union, Morris, and Somerset counties. In addition to being qualified previously as an expert in Superior Court, Carrico testified he's also been qualified as an expert in the Tax Court, the United States Bankruptcy Court for the District of New Jersey and before condemnation commissioners in Somerset County. His report lists him as a staff appraiser with the Otteau Group and further notes his appraisal of Cragwood was conducted with the principal of the Group, Christopher Otteau, who holds both MAI (Member of the Appraisal Institute) and AI-GRS (Appraisal Institute – General Review Specialist) certifications and both men signed the Cragwood appraisal report and the firm's Rebuttal Report.

Although we obviously offer no view as to the expert's credibility, he was plainly well-qualified to have rendered an opinion in the matter as the parties' stipulation attested. If the lack of an MAI certification "despite decades working as an appraiser," however, was important to the judge's assessment of the appraiser's credibility, it should perhaps have been put to the appraiser on the record to have allowed him to address it.

26

The judge found "Carrico never made a physical inspection of the property" and instead relied on "plaintiff's expert Sockler and internet references."[14] The judge also found the comparable sales identified by Carrico "deficient as they were all out of the area of Far Hills and Bernardsville." The judge found Carrico had testified "that because of the uniqueness of the property, you can go outside of the market," and "note[d] that plaintiff's expert

_____

[14] Besides failing to note that Carrico had not been retained until after Cocoziello's purchase of the property, when neither appraiser could gain access, the statement that Carrico had never physically inspected the property is not true. Carrico testified under oath he had previously inspected the property, albeit not for this appraisal. The judge barred that testimony and any reference to an appraisal Carrico had completed for the Bailyes several years prior to this case. Although the report had been turned over in discovery well before a prior judge's final deadline for the exchange of expert reports, the bank objected to any reference to it at trial because plaintiffs hadn't advised they would be relying on it before filing their pre-trial memorandum.

Although there may have been little evidentiary value in an appraisal completed so many years before, there was no basis for having barred it at trial based only on another judge's discovery order setting a deadline for rebuttal reports, which plainly did not apply to this appraisal. And in no event should the bank have been able to use the ruling to prevent Carrico from testifying he had previously inspected the property — as bank's counsel did at trial. See Gonzalez v. Safe & Sound Sec. Corp., 185 N.J. 100, 117 (2005) ("A plaintiff does not get to present to the [the factfinder] his evidence while suppressing another party's evidence . . . . The defendant, as much as the plaintiff, has a right to his day in court.").

27

Sockler did not go outside the area."[15]  The judge also faulted Carrico for relying on comparable sales, "which were far out a time from the six-month recommended that the court finds was the acceptable timeframe for an appraiser accepting . . . a comparable property value."[16]

---

[15]  The judge appears, however, to have confused or misunderstood the experts' reports.  All but one of the comparable sales Carrico included in his report were within Somerset County, specifically, Bernardsville, Bedminster and Far Hills, with one being in Mendham in neighboring Morris County.  Sockler's comparable sales were likewise in Bernardsville, Bedminster and Far Hills except for one located in Ridgewood in Bergen County, well out of what both experts agreed was the "market area."  Sockler testified he went outside the market area because "we didn't have a lot of current sales" near Cragwood, "so we reached out to something that would have a similarly high [value] and house on it for estate-type property."  Carrico testified Ridgewood was fifty miles away from Cragwood, and the distance and difference in density between Bergen and Somerset counties should have excluded consideration of the Ridgewood property as a comparable sale.

[16]  The judge relied on Sockler's testimony that "if you were doing this appraisal for a bank, a residential appraisal, they don't want comparables older than six months from the date of valuation."  Sockler, however, didn't identify any appraisal standard governing the timing of comparable sales, particularly concerning an estate property such as Cragwood and nor did the judge.  Carrico agreed that banks don't want comparable sales more than six months old when appraising the value of a typical residential property on a 50' x 100' lot where there are many recent comparable sales.  He explained, however, that estates such as Cragwood rarely change hands, and it's likely there will be no comparable sales in the market within such a time period.  In that case, the appraiser would look back "in recent years, and discover sales that are more similar to the subject, and . . . rely on statistical data to adjust upward or downward, depending on the market trends, from that time period to today."

28

The judge accepted Sockler's testimony that the 39-item list presented by Cocoziello to the bank was "a professional estimate," because "[t]hat's what Mr. Cocoziello does," and an accurate assessment of the condition of the property, including his description of the "two cesspools, which as testified at trial are illegal in New Jersey and removal, which would require the placement of septic systems."[17]

---

[17] Our review of the trial transcript does not reveal <u>any</u> testimony from anyone with personal knowledge as to whether there are cesspools on the property, leaving aside their condition, in contrast to the testimony about the presence and condition of the underground storage tanks. And although Farnsworth testified to the cesspools as "being illegal," which the court accepted, neither plaintiff's counsel nor the judge cited any law for that proposition.

N.J.A.C. 7:9A-3.16(b) has since 2012, with certain exceptions, required "all cesspools . . . that are part of a real property transfer shall be abandoned and replaced" with a system conforming to N.J.A.C. 7:9A-3.2. "A cesspool that is not malfunctioning may continue to serve the structure after a real property transfer" resulting from a mortgage foreclosure and sheriff's sale. N.J.A.C. 7:9A-3.16(c)(3). "A person claiming to qualify for an exemption under [N.J.A.C. 7:9A-3.16(c)(3)] shall document the exemption that applies by providing to the administrative authority [the local Board of Health] applicable State of New Jersey Affidavit of Consideration of Use forms available through the New Jersey Department of Treasury and all supporting documentation."

There was no testimony that the bank had applied for such an exemption, and Sockler noted fifteen months after Cocoziello's purchase that he had "not remediated" either the cesspools or the tanks. It is unclear where Sockler acquired that information and whether he made any inquiry with the local Board of Health about the cesspools, which is the administrative authority charged with maintaining the applicable records. <u>See</u> N.J.A.C. 7:9A-3.15.

29

The judge found "Sockler was aware that Peter Cocoziello was an experienced real estate developer and investor" and accordingly "adjusted the value of the property to $5.36 million from his original $6.65-million-dollar first appraisal" based on the list Cocoziello had provided to Farnsworth.[18]  The judge accepted Sockler's testimony that "the $6 million sale of the property to Cocoziello" was "an arm's length transaction and . . . the best evidence of value."

The judge concluded the bank had "made reasonable, and business-like decisions," including the "decision to consider the list presented by Cocoziello," which "ultimately result[ed] in an $800,000 credit" against the contract price of $6.8 million.  The judge found "the cesspools, the underground tanks, the condition of the property needing maintenance and

---

Whether the absence of such information casts doubt on the accuracy of Cocoziello's representations about the presence of cesspools on the property is not for us to say.

[18]  In the appraisal he prepared for the litigation, Sockler had already reduced his appraised value of Cragwood by $550,000, down to $6,100,000 from his initial value of $6,650,000 "based on more refined information," "[b]ecause what we did is we refined our analysis."  "So that is our opinion for this appraisal.  And it's refined."  Sockler testified the appraisal "was refined based on more analysis and understanding of the market."  Sockler apparently further "refined" his analysis for the litigation by further reducing his appraised value by the $800,000 Cocoziello negotiated off the contact price, leaving his final appraised value at $5,360,000, down $1.3 million from his first appraisal.

attention were reasonable considerations in [the bank's representatives'] determination to sell and for what price." Ultimately, the judge concluded that despite a "detailed and rigorous cross examination" of the bank's expert, nothing "changes the fact that after substantial efforts to market the property both by John Bailye and the bank, there was [never] an offer greater than $6 million, the price [for] which the property was sold."[19]

We think it obvious from our summary of the pre-trial rulings and account of the conduct of the trial that this judgment cannot stand. Although we've noted the factual flaws in the judge's opinion and his apparent misunderstanding of the experts' testimony, that is not the focus of our analysis.[20] The bank's theory at trial, as expressed by the bank's counsel in his

---

[19] That statement would also appear not quite accurate. There is no dispute that at the time of the cancelled auction in October 2018, which did not include the seventeen-acre parcel, there was a standing offer of $1.5 million for that parcel and a $5 million pre-bid at auction for the remainder of the estate, for a total of $6.5 million.

[20] We acknowledge that determining the fair value of this property was not simple and required the court to scrutinize the expert reports and familiarize itself with the appraisal standards necessary to evaluate the experts' choices of comparable sales and adjustments, see American Institute of Real Estate Appraisers, The Appraisal of Real Estate (15th ed. 2020), a task much more routine for judges in the Tax Court than in the Law Division. There is, however, no other option in order to decide the case fairly. Happily, there is a well-developed body of case law available thoroughly explaining the process a

opening statement, was that Carol Farnsworth, the asset manager charged with selling Cragwood, "followed bank protocol" in securing an appraiser who "got everything" other than "an environmental report on the property," and did "a tremendous job negotiating this property and keep[ing] the buyer for $6 million" for a property now "not worth much" after the buyer's discovery of "illegal" cesspools and underground storage tanks.

Farnsworth testified the bank has policies and procedures for the sale of OREO properties. According to her, those policies require the preparation of a written disposition plan for the property, and that the bank secure an appraisal of the property within ninety days of the foreclosure sale. She testified there is a procedure for appraisal review and reconciliation, which would have occurred here when there were two appraisals within a year that were $10 million apart. Farnsworth also testified she never received any backup from Cocoziello for the items on his list, including any estimates, inspection reports

---

court should follow in resolving such matters. See e.g. Glen Wall Assocs v. Tp. of Wall, 99 N.J. 265, 281-84 (1985); Pansini Custom Design Assocs., LLC v. City of Ocean City, 407 N.J. Super 137, 143-48 (App. Div. 2009); Ford Motor Co. v. Edison Tp., 10 N.J. Tax 153, 161-92 (Tax Ct. 1988), aff'd 12 N.J. Tax 244 (App. Div. 1990), aff'd 127 N.J. 290 (1992); Greenblatt v. Englewood City, 26 N.J. Tax 41, 52-56 (Tax Ct. 2010).

or environmental evaluations, never requested any, and never confirmed the presence of either cesspools or underground storage tanks on the property.

Farnsworth's supervisor, Penfield, testified the bank needed to validate the existence of a problem alleged by a contract purchaser in order to justify negotiating a reduction of the contract price, and he believed the bank was able to validate the existence of both the cesspools and the tanks, "the riskiest items," although he could not say how. According to Penfield, it was his job "as a manager overseeing this stuff," "to make sure" people like Farnsworth were "doing their job according to the policies and procedures of the bank."

Defendants, however, were never permitted to see the bank's policies and procedures because another judge granted the bank's motion for a protective order blocking their production. The bank in its privilege log identified four documents it claimed were protected trade secrets:

1. "Booking Real Estate into OREO — Commercial," August 22, 2014.

2. "Booking Real Estate into OREO from Workout," August 22, 2014.

3. "Decision Procedure for OREO Sale Offers," October 20, 2014.

4. "Determining a Listing Price for the OREO Inventory," October 20, 2014.

33

The bank did not offer a certification from anyone with personal knowledge or a witness to testify at the in-camera hearing as to why the bank considered the documents to be trade secrets and the steps they took to protect them. See Trump's Castle Assocs. v. Tallone, 275 N.J. Super. 159, 164-65 (App. Div. 1994) (explaining the importance of the testimony of a witness at the in-camera hearing to explain to the court "the nature of the confidential information and the precise reasons urged for secrecy").

Instead, bank counsel noted the following for each item:

> "Trade secret" has been defined as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." Trump's Castle Assocs. v. Tallone, 275 N.J. Super. 159, 162 (App. Div. 1974). Plaintiff is a bank in the business of extending credit. Plaintiff's credit and OREO policies are "used in the operation of [its] business" in competing with other banks.

The judge had not reviewed the documents prior to the remote hearing, and on opening them on his computer found them indecipherable without a witness to explain them. Rejecting defendants' offer that the bank produce the documents pursuant to protective order, and without analysis of the law governing trade secrets, the judge granted the bank's motion, finding the documents were protectable trade secrets.

34

The bank cites not a single case in its appellate brief to support its argument that it had established the documents are protectable trade secrets, which it did not make any serious attempt to do on its motion for a protective order. See Hammock by Hammock v. Hoffmann-Laroche, 142 N.J. 356, 384 (1995) (summarizing the factors courts consider in determining whether information is a trade secret). We, thus, consider the argument abandoned. See 700 Highway 33 LLC v. Pollio, 421 N.J. Super. 231, 238 (App. Div. 2011) (noting the requirement that parties make "an adequate legal argument" to allow consideration by the court).

Instead, tacitly conceding it failed to establish the documents were protectible trade secrets in the trial court, the bank contends "defendants ignore that the court entered the protective order because the bank's internal policies and procedures were not likely to lead to the discovery of admissible evidence." It takes liberties with the record.

The judge who entered the protective order never cited the Rule 4:10-2(a) standard that parties are entitled to "discovery regarding any matter, not privileged, which is relevant" to the claims or defenses in the action, without regard to admissibility, so long as "the information sought appears reasonably calculated to lead to the discovery of admissible evidence." And the protective

35                                                                 A-0896-22

order drafted by bank's counsel refers only to trade secrets. The only arguable reference to relevancy in the court's colloquy with counsel was its comment that if defendants intended to argue the sale to Cocoziello was commercially unreasonable, it "can retain an expert," and that defendants could prove the bank "violated any law, regulation, [or] industry standard in the way this loan was handled . . . without regard to [its] own internal documents."

Although our review of a discovery order is decidedly deferential, Brugaletta v. Garcia, 234 N.J. 225, 240 (2018), we remain mindful "[o]ur court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties [may become] conversant with all the available facts," Capital Health Sys. Inc. v. Horizon Healthcare Servs. Inc., 230 N.J. 73, 79-80 (2017) (quoting Jenkins v. Rainner, 69 N.J. 50, 56 (1976)). It is not the court's role to decide how a party can best prove its claims; the burden of overcoming the presumption of discoverability is on the party resisting the discovery. R. 4:10-3; Kerr v. Able Sanitary & Env't Servs., Inc., 295 N.J. Super. 147, 155 (App. Div. 1996).

The OREO policies are undoubtedly relevant, that is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action," N.J.R.E. 401, to defendants' central defense to

this deficiency action: that plaintiff obtained less than fair value for Cragwood because it handled the sale in a commercially unreasonable manner and likely contrary to its own policies for selling OREO assets. That a party's own internal policies may not establish the "industry standard" of care is obviously not determinative of their discoverability. See Cast Art Indus., LLC v. KPMG LLP, 416 N.J. Super. 76, 106 (App. Div. 2010) (holding "[a] defendant's 'internal policies — standing alone — cannot demonstrate the applicable standard of care'") (quoting Briggs v. Wash. Metro. Area Transit Auth., 481 F.3d 839, 848 (D.C. Cir. 2007)), rev'd on other grounds, 209 N.J. 208 (2012). Such policies should be deemed inadmissible at trial only "if they require a standard of care which transcends the traditional common-law standard of reasonable care under the circumstances," ibid. (quoting Branham v. Loews Orpheum Cinemas, Inc., 819 N.Y.S.2d 250, 255 (App. Div. 2006)), a decision that could be made only after discovery of the policies.

While we are confident there was no reason to have questioned the discoverability of the bank's OREO policies on the motion record, especially given defendants' willingness to obtain the documents subject to a protective order, even if their ultimate admissibility was uncertain, see Isetts v. Borough of Roseland, 364 N.J. Super. 247, 262 (App. Div. 2003), it was the bank's

37

reliance on those same policies to establish its affirmative claim at trial that so prejudiced the defendants and requires reversal of the judgment.

Plaintiff's touting of its conformance with its policies to establish the reasonableness of its actions, including the price it had negotiated for the property, and Sockler's subsequent reliance on the sale to establish fair value, while the bank blocked defendants from even knowing what those polices were, made the proceeding patently unfair. As our Supreme Court has reminded, "[b]ecause one of the essential purposes of a civil trial is the search for truth, the one who initiates that process by filing a complaint cannot be permitted to obstruct that search when it becomes unpleasant or inconvenient." Gonzalez v. Safe & Sound Sec. Corp., 185 N.J. 100, 117 (2005).

The trial judge accepted the bank's tautology: there was never an offer over $6 million for Cragwood, so $6 million was the highest offer and, thus, properly accepted by the bank. See Lewis v. Harris, 378 N.J. Super. 168, 204 (App. Div. 2005) (rejecting the State's argument that plaintiffs, same-sex couples, "cannot marry because by definition they cannot marry. . . . Therefore, opposite-sex marriage is a tautology. Same-sex marriage, an oxymoron. We need go no further. Case closed.") (Collester, J., dissenting), aff'd in part, modified in part, 188 N.J. 415 (2006). The argument is circular.

And defendants were prevented from effectively challenging it because they were not permitted to discover the bank's policies for booking real estate into the OREO department, for developing a listing price for those properties, and its procedures for making decisions on sale offers for OREO property.

We are also convinced the judge erred in barring defendants' use at trial of the Kamand appraisal based on defendants' failure to "formally name Kamand as an expert." Defendants were not intending to call Kamand as their expert, and thus were not required to identify him as such pursuant to either Rule 4:17-1 or Rule 4:17-7.

Defendants' interest was in exposing how the bank reconciled the appraisals — as Farnsworth testified the bank's policies required — it had obtained of the same property that were thirteen months and $10 million apart. The issue arises in an unusual context as the bank is apparently attempting to shield what is clearly its own business record under N.J.R.E. 803(c)(6), presumably on the grounds it is not trustworthy under N.J.R.E. 808. We are, however, without sufficient information to resolve the question, and thus do not do so. We expect discovery of the bank's policies on remand, including whether there is any internal requirement or government regulation for the bank to have obtained the Kamand appraisal, will illuminate the admissibility

39

of the document in any re-trial of the matter. See Konop v. Rosen, 425 N.J. Super. 391, 404-05 (App. Div. 2012).

We are also satisfied the court erred in dismissing defendants' counterclaims for violation of the Consumer Fraud Act and breach of the implied covenant of good faith and fair dealing on summary judgment believing they failed to state cognizable causes of action in defense to the bank's efforts to collect a claimed deficiency. Defendants clearly stated causes of action for both and should be allowed the opportunity to establish the claims on remand.

The bank's assertion that there is no case law supporting application of the Consumer Fraud Act to mortgage-backed loans is incorrect. Our Supreme Court recognized the applicability of the Act to such loans in Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 584 (2011) (holding "[l]ending institutions and their servicing agents are not immune from the CFA"). There, the Court determined that unconscionable practices "in fashioning and collecting on" a loan constitute commercial practices "in connection with . . . the subsequent performance" of a loan that violates the CFA. Id. at 587; N.J.S.A. 56:8-2.

A-0896-22

To establish a cause of action under the CFA, a plaintiff must prove:  "1) unlawful conduct by defendant; 2) an ascertainable loss; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)).  An unlawful practice under the Act is defined as

> the use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .
>
> [(N.J.S.A. 56:8-2).]

Here, the trial court found the bank had attempted to collect from defendants $1.22 million to which it was plainly not entitled under the loan documents or any law in the guise of a "holding and overhead charge" having no relation to the amount due on the mortgages.  Plaintiff did not file a cross-appeal to challenge that finding, and we affirm it as it has ample support in the record.  Thus, there can be no dispute that defendants have established the first

41

element of their prima facie CFA claim — that the bank's attempted collection of the $1.22 million "holding and overhead charge" was an "unconscionable commercial practice" "in connection with . . . the subsequent performance" of a loan that violates the CFA.

Plaintiff is also incorrect that defendants cannot establish "an ascertainable loss." We held thirty years ago that "the reasonable counsel fee associated with raising a meritorious claim under the Act is an obligation owed by the claimant. As such, it is as ascertainable a loss as any other out-of-pocket expense resulting from a violation of the Act's terms, specially treated only in the respect that it is not subject to the trebling for which other losses qualify." BJM Insulation & Const., Inc. v. Evans, 287 N.J. Super. 513, 517 (App. Div. 1996). The Act "makes no distinction between a person who raises the Act's provisions in an affirmative claim and one who pleads it as a defense." Id. at 516. See also Delta Funding Corp. v. Harris, 189 N.J. 28, 49 (2006) (holding attorney's fees and costs are available to a defendant under the Act "if she successfully asserts CFA-based defenses in the foreclosure action").

We have no hesitation in holding that the bank's efforts to collect $1.22 million it was not entitled to in this deficiency action supports defendants'

claim for violation of the CFA. We are likewise satisfied the same conduct gives rise to a claim for breach of the implied covenant of good faith and fair dealing, which "calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224-25 (2005) (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965)). "A plaintiff may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." Id. at 226; see also Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 63 (2024) (same). Although we express no opinion on defendants' ability to ultimately prove either claim, they have clearly stated causes of action and dismissal of the claims and refusal to reinstate them based on the evidence adduced at trial was clear error.

Finally, we reject defendants' argument that the deficiency action statutes apply here. Our deficiency action statutes, which generally require "foreclosure first" of a residential mortgage and guarantee a mortgage debtor's statutory right to a fair market value credit, represent the Legislature's attempt to limit the mortgagee's array of common law remedies against mortgagors and

others liable for the mortgage debt by making the lender look primarily to the land to satisfy its debt. See 30A N.J. Practice, Law of Mortgages § 39.1 (Myron C. Weinstein) (2d ed. 2000 & Supp. 2022). There are, however, several exceptions to their applicability, including the one that applies here.

N.J.S.A. 2A:50-2.3 provides in pertinent part:

> This act shall not apply to proceedings to collect a debt evidenced by a note and secured by a mortgage on real property in the following instances:
>
> b. Where the mortgaged property is other than a one-family, two-family, three-family or four-family dwelling in which the owner or his immediate family resides at the time of institution of proceedings to collect the debt. . . .

The record contains ample evidence to support the trial court's finding that the Bailyes had relocated their family to England in 2015 and were not living at Cragwood in June 2018 when the bank started its foreclosure. Although the Bailyes contend a person can have more than one residence and, as they were not legal residents of the United Kingdom, Cragwood remained their only residence, the law on this point is well-settled.

We held over twenty-five years ago in Arne v. Liotta, 313 N.J. Super. 616, 621 (App. Div. 1998) that "the statutory reference to residence is not the equivalent of 'domicile' and that the two terms are not to be treated as

44

convertible terms absent specific indication of legislative intent to that effect." Moreover, we found interpreting the statute as defendants would, as applying to as many residences as a defendant maintained, "is not supported by the legislative intent to protect debtors from being ejected and barred from their homes." Id. at 622. Moreover, we noted that such a reading "conflicts with the overall purpose of the Mortgage Foreclosure Act since property owners living outside their homes could insulate themselves from deficiency actions through an assertion of intention to return to the residence." Id. at 622-23. We see no reason to depart from Arne and find the deficiency action statutes do not apply here.[21]

Defendants argue that even if the exemption in N.J.S.A. 2A:50-2.3(b) applies against the obligors, it does not apply against guarantors such as the Bailyes, who are subject to a different part of the deficiency statutes, namely N.J.S.A. 2A:50-22 to -28. We reject the argument as without sufficient merit

---

[21] That the deficiency action statutes do not apply does not deprive defendants of a fair market value credit. See West Pleasant-CPGT, Inc. v. U.S. Home Corp., 243 N.J. 92, 108 (2020) (noting "the legislative purposes of the fair market value credit under N.J.S.A. 2A:50-3 have informed the Court's equity jurisdiction where the statute would not otherwise apply"); see also 79-83 Thirteenth Ave., Ltd. v. De Marco, 44 N.J. 525, 534 (1965) (declining to "overlook the broad equitable concept that a mortgagee is not entitled to recover more than the full amount of the mortgage debt"). The bank does not disagree.

to warrant discussion here, R. 2:11-3(e)(1)(E), as the only case defendants cite for their argument, River Edge Sav. & Loan Ass'n v. Clubhouse Assoc., Inc., 178 N.J. Super. 177, 181 (App. Div. 1981), does not support the proposition. See Weinstein, Law of Mortgages § 39.7 (noting "[t]he 'act'" referred to in N.J.S.A. 2A:50-2.3 is the 1979 act, "[a]n act concerning civil actions for the collection of bonds and notes secured by mortgages, amending §§ 2A:50-2 to 2A:50-10, inclusive and § 2A:50-22 of the New Jersey Statutes, and supplementing chapter 50 of the New Jersey Statutes. 1979 N.J. Laws ch. 286"). "This statute has been consistently applied by the courts to take an action on the instrument of obligation out of the purview of the deficiency action statutes, N.J.S.A. 2A:50-2 to 2A:50-10 and 2A:50-22 to 2A:50-28, where any one of the exceptions apply." Ibid. See Lenape State Bank v. Winslow Corp., 216 N.J. Super. 115, 132 (App. Div. 1987) (holding the debtor, who was also the guarantor, was not entitled to the protections of the deficiency action statutes pursuant to N.J.S.A. 2A:50-2.3(a) on either obligation).

To sum up, we affirm the trial court's rulings that the deficiency statutes do not apply, and that plaintiff's post-sale costs to be added to the amount due are limited to the $16,430.40 it actually expended. We reverse the deficiency

46

judgment, the court's protective order shielding the OREO policies, and the dismissal of defendants' counterclaims for breach of the covenant of good faith and fair dealing and the Consumer Fraud Act and remand for the reopening of discovery on those claims and issues and a new fair value hearing. Lastly, because the trial judge has made credibility findings, the case should be assigned to a different trial judge on remand.

Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0896-22